# EXHIBIT A

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,     : 23-CR-443(FB)
                              :
                              :
                              :
                              :
                              : United States Courthouse
     -against-                : Brooklyn, New York
                              :
                              :
                              :
                              : Tuesday, November 21, 2023
DIEGO TANTILLO and            : 2:30 p.m.
ANGELO GRADILONE,             :
                              :
     Defendants.              :
                              :
- - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL APPEAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government:     UNITED STATES ATTORNEY'S OFFICE
                        Eastern District of New York
                             271 Cadman Plaza East
                             Brooklyn, New York 11201
                        BY: ANDREW M. RODDIN, ESQ.
                             Assistant United States Attorney

For the Defendant:      THE WEINSTEIN LAW FIRM, PLLC
                        Attorneys for the Defendant -
                        Diego Tantillo
                             800 Third Avenue
                             18th Floor
                             New York, New York 10022
                        BY: ANDREW J. WEINSTEIN, ESQ.

                        FEDERAL DEFENDERS OF NEW YORK
                        For the Defendant -
                        Angelo Gradilone
                             One Pierrepont Plaza
                             16th Floor
                             Brooklyn, New York  11201
                        BY: MICHAEL K. SCHNEIDER, ESQ.

2

A L S O   P R E S E N T :


                    UNITED STATES
                    PRETRIAL SERVICES AGENCY
                    Eastern District of New York
                         225 Cadman Plaza East
                         Room 219
                         Brooklyn, New York 11201
                    BY: THOMAS RAGOGNA
                         Pretrial Services Officer


Court Reporter:   Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                  Official Court Reporter
                  Telephone: (718) 613-2487
                  Facsimile: (718) 613-2694
                  E-mail: Anthony_Frisolone@nyed.uscourts.gov

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

1      (In open court.)

2      (Defendants enter the courtroom at 2:47 p.m.)

3      COURTROOM DEPUTY:  Criminal cause for a bail

4  appeal.  United States of America versus Tantillo and

5  Gradilone.

6      Counsel, state your appearances for the record.

7      MR. RODDIN:  Appearing for the Government,

8  Assistant U.S. Attorney Andrew Roddin.

9      Good afternoon.

10     MR. WEINSTEIN:  Andrew Weinstein.  And with me at

11  counsel table is my co-counsel Mark Ferniche on behalf of

12  Mr. Tantillo.

13     Good afternoon, Judge.

14     THE COURT:  Good afternoon.

15     MR. SCHNEIDER:  Federal Defenders by Michael

16  Schneider for Mr. Gradilone who is at counsel table.

17     THE COURT:  So we have a few things to discuss, and

18  there may not be any necessary order or sequence, but this is

19  what I want to talk about.

20     Mr. Roddin, I have to get a handle factually about

21  how these two cases substantively differ from those cases

22  where the co-defendants were released on bond.  I'm not clear

23  that there is a real significant factual distinction.  I know

24  there are factual differences.  But for the substantive

25  overall concept considering the Bail Reform Act and the

1  presumption that people are entitled to their liberty pending

2  trial, I don't understand how these cases are significantly

3  different; you're going to have to educate me about that.

4           But before you start, when I read Judge Reyes's

5  decision, he may have inadvertently said that -- you're

6  entitled to a hearing, there's no question about it and we're

7  here for that purpose.  But I think he also said that there

8  is a presumption of detention and then may be changed his

9  mind and he went on to talk about substantively about whether

10 there is a danger and stuff like that.

11          So I was a little confused about that because I

12 don't see where there is a presumption of detention here from

13 what I've read.  I think the presumption is that they're

14 entitled to their liberty under the Bail Reform Act and that

15 you would have the burden of overcoming that.

16          Can you clarify that for me?

17          MR. RODDIN:  Yes.  I will begin with the

18 presumption question and then I will turn to the factual

19 differences.

20          THE COURT:  You are certainly entitled to the

21 hearing, we're here for that purpose.

22          MR. RODDIN:  Judge Reyes did not apply a

23 presumption of detention.  There was, as you say, an

24 inadvertent comment about a presumption and Mr. Weinstein

25 raised that to Judge Reyes's attention and said, as a point

*Bail Appeal*                                                          5

1   of clarification, I don't believe -- this is at Page 31 of

2   the transcript -- Mr. Weinstein said, "As a point of

3   clarification, I don't believe -- "

4                THE COURT:  Hold it, a little slower.  It's okay,

5   we're not in any rush.  When I was your age, about three or

6   four years ago, I used to talk very, very quickly.  But

7   Mr. Schneider knows over the last 29 years I've slowed down,

8   I think, yes or no?

9                MR. SCHNEIDER:  Yes.

10               THE COURT:  When you first met me how many years

11  ago, I was talking as fast as Mr. Roddin, right?

12               MR. SCHNEIDER:  That's correct.

13               THE COURT:  Get the point?

14               MR. RODDIN:  Understood, Judge.

15               THE COURT:  Not easy, by the way.  You have to try

16  to do to because we also want to make sure that all your

17  words of wisdom are going to be properly recorded, okay?

18               MR. RODDIN:  Mr. Weinstein raised the question of

19  the presumption to Judge Reyes and said, actually, there

20  isn't a presumption of detention here.  And Judge Reyes

21  followed up by saying the Government has submitted extensive

22  evidence, those were his words, extensive evidence, that the

23  defendants ought to be detained.

24               THE COURT:  He went ahead and dealt with the

25  substance of it all.  But I think he did initially say

1   something that he thought that there was a presumption of

2   detention but there's none.

3           You agree with that?

4           MR. RODDIN:  That's correct.

5           THE COURT:  So he may have inadvertently spoke and

6   then he went to deal with it substantively.  And he got

7   elevated to district court judge because he said that,

8   correct?

9           MR. RODDIN:  Certainly, he did not apply a

10  presumption of detention and that's clear from what he said.

11          THE COURT:  So let's talk about the other stuff.

12          Educate me factually about why these folks should

13  really be kept in jail while the others are at liberty.

14          MR. RODDIN:  So beginning with Mr. Tantillo.  The

15  violence is what makes the difference between Mr. Tantillo

16  and at least one of the other defendants which would be

17  Vincent Minsquero.

18          There was discussion at the arraignment of

19  Mr. Minsquero's role, in particular, in a gas station

20  incident that's described in the detention memo.  And the

21  violence attributable to Mr. Tantillo, I think, differs

22  significantly from what's discussed in that portion of the

23  detention memo as to Mr. Minsquero even though, as I said at

24  the time, Mr. Minsquero was not defusing the situation out of

25  the goodness of his heart.

1          THE COURT:  But the others who have been let out, I

2    haven't really memorized what all the charges are against

3    them.  My general sense is that it pretty much runs the gamut

4    a lot of bad things, but nonetheless, they were given bail.

5    In the past, we let murderers out on bail.  People charged

6    with murders.  That's not uncommon.  I mean, we don't have

7    anything close to that in this particular case, fortunately.

8    I guess, the younger generation of the Mafioso are not

9    killing people these days, right?

10         So we have all these other crimes.  But in the past

11   many times, people have been given bail as long as there is a

12   proper pail package, right?  Even though their crimes were

13   much more violent than what we're talking about here.

14         Am I missing something?

15         MR. RODDIN:  Well, I think partly, Judge, there's

16   the violence to consider.  There's also the nature of the

17   charges, which is the next point I was going to make, against

18   Mr. Tantillo and Mr. Gradilone.

19         THE COURT:  Tell me about the nature of the charges

20   against the two of them.  I think against one of them it's a

21   no-show charge, right.

22         MR. RODDIN:  No, against both of them it's a RICO

23   conspiracy.

24         THE COURT:  What does that mean?  The underlying

25   predicate acts are what?

1          MR. RODDIN:  Because it's a Glecier conspiracy,

2     specific predicate acts aren't pled in this indictment.  But

3     as to each of them, the objects of the conspiracy included

4     things like arson, assault, and extortion.

5          THE COURT:  Those are against both of them?

6          MR. RODDIN:  Yes.

7          THE COURT:  I thought one was basically just

8     charged with a no-show situation.

9          MR. RODDIN:  Both are charged with participating in

10    a conspiracy that involved, as its objects, those crimes,

11    among other things.

12          Now, Mr. Gradilone is charged in the standalone

13    counts with theft from employee benefit plans.  He's not

14    charged in standalone counts with arsons and assaults and

15    extortions.

16          THE COURT:  It just candidly doesn't strike me that

17    these charges are of the dimension which I've seen in the

18    past.  I've had, as you know, probably a bunch of these

19    cases, right?  I had the Peter Gotti case, I've had a bunch

20    of them.  So I'm pretty familiar with the character of the

21    Mafioso, et cetera, et cetera.  But I don't see where this

22    things rings the bell with me and maybe I'm missing something

23    that you can't deal with by imposing significant bail

24    conditions which is what we normally do here.  They're not

25    going any place.

1        MR. RODDIN:  I think one of the other differences,

2   though, between -- and I'll focus on Mr. Gradilone for a

3   moment.  Between Mr. Gradilone and some of the other

4   defendants who were released, is a significant criminal

5   history.  And as we detail -- it's old granted.

6        THE COURT:  You read my lips.  It goes back to 2019

7   or something like that.

8        MR. SCHNEIDER:  2000, Judge.

9        THE COURT:  2000?

10        MR. SCHNEIDER:  That's the last felony conviction.

11        THE COURT:  A long, long time ago.

12        MR. RODDIN:  That's correct.  It is a serious

13   criminal history and it involves the possession of weapons

14   and I think that's certainly a factor the Court needs to

15   consider not only in assessing his dangerousness but also his

16   risk of flight.

17        THE COURT:  Let me divert, with my apologies, but

18   that's what I tend to do.  I don't see any risk of flight

19   here.  I know that that's one of the things that we ought to

20   consider, but I don't see any real significant risk of

21   flight.  I certainly they can't be cured by bail conditions.

22   So I think we're talking about danger to the community if I

23   read this correctly.

24        MR. RODDIN:  Well, I submit that both are present.

25   I understand the Court does not see a risk of flight as to

1    either but I submit that both are present.

2         THE COURT:  I don't see that.  If you want to try

3    to argue that there is a risk of flight, you certainly can do

4    so.  I don't think it will necessarily be something that you

5    may want to do.  You may want to focus on your stronger

6    argument that these are dangerous people.  But if you want to

7    frivolously talk about risk of flight, I will give you the

8    opportunity to do so.

9         MR. RODDIN:  Seeing that this will the not be a

10   successful argument before this court, I won't focus on the

11   risk of flight.

12        THE COURT:  Okay.

13        MR. RODDIN:  What I will focus on is the

14   significant danger presented by the conspiracy that both

15   defendants --

16        THE COURT:  That's the focus.

17        MR. RODDIN:  That both defendants are charged with

18   taking part in.

19        THE COURT:  And you think the Government has

20   overcome the presumption attaches to allow these people to be

21   at liberty who have been not been convicted of a crime at all

22   because of the serious nature of the crimes that are charged.

23   And you have a lot of information which you've given me that

24   shows they did some bad things, I get it.

25        Is that basically the thrust of your argument?

Case 1:23-cr-00443-FB   Document 105-1   Filed 11/27/23   Page 12 of 27 PageID #: 698

1          MR. RODDIN:  Absolutely.

2          THE COURT:  Okay.

3          MR. RODDIN:  There are numerous violent extortions

4    and attempts at violent extortions detailed in the detention

5    memorandum and charged in the indictment.  The Court has seen

6    the photos of what resulted to two of the victims of those

7    extortions.

8          THE COURT:  You laid it out and you may be right.

9    But as I understand the law, I think I understand it

10   correctly, that even if you have a very weighty case that

11   doesn't mean it's lights out.  It's certainly a serious

12   factor to consider but it's not really a per se determination

13   that would warrant their detention.  It's something for me to

14   consider, do you agree with that?

15         MR. RODDIN:  Certainly.  That's not the end of the

16   inquiry at all.

17         THE COURT:  Let me then switch and give you a

18   chance to catch your breath when I ask these distinguished

19   members of bar here, your colleagues.

20          So we are talking about some serious evidence that

21   I read.  I've seen the pictures and there seems to be some

22   credible basis to what the Government has put forward.  Why

23   should that not be sufficient to keep them in jail.

24         Mr. Weinstein, you go first.

25         MR. WEINSTEIN:  Well, may it please the Court.

1          Your Honor, there are allegations, there has been a

2     finding of probable cause with the return of the indictment.

3     Basically, what the Government's argument boils down to its

4     essence is when a defendant is charged with crimes of

5     violence, and they throw the word "Mafia" around, that's the

6     end of the ball game.

7          So there are -- my argument is really --

8          THE COURT:  Let me interrupt you.

9          They're doing more than that.  They really have

10    come forward with concrete evidence:  Pictures, photographs,

11    lots of other things, right?  Burning down the house, you

12    name it.  So it's not just mere allegations, there's

13    something concrete behind that.  I'm not saying that that

14    really gives your client jail until the trial, but I just

15    think you have to address that.

16         I have to weigh that, right?

17         MR. WEINSTEIN:  A hundred percent.

18         THE COURT:  Okay.  And why should I not weigh that

19    in favor of the Government's position?

20         MR. WEINSTEIN:  I think you can weigh that in favor

21    of the Government's position with one proviso which is we're

22    not here to have a minitrial.  We haven't been provide

23    discovery, they had evidence tying Mr. Tantillo to a reported

24    assault, the thing with the hammer.  The evidence that they

25    put forth is someone sent someone a text message.  We haven't

1   seen the other text messages.  I guess, I suppose, that if

2   you were to ask the Government, hey, Government were there

3   any or text messages between these two people?  How many

4   dozens or hundreds of there were there relating to work that

5   might put things in context?  When they're talking about the

6   big quote, unquote, extortion, this thing about $4 million in

7   dumping fees after somebody gets hit in December of 2019,

8   there is a huge, huge backstory there.

9          We are talking about a company that Mr. Tantillo

10  was a part owner of and was employed by for 25 years; who had

11  millions of dollars of post-tax equity built up in that

12  company.  And when there was a separation, that when they

13  fired him in June of 2019, he went out, he hired a white

14  shoe, prestigious law firm to negotiate a separation from

15  them.  This was all done in conference rooms with lawyers

16  over the period of a year or more.

17         And so, they talk about someone got into a fight in

18  a garage and then they try and say, shortly thereafter

19  Mr. Tantillo got $4 million in reduced dumping fees.  Not so.

20  There's a four- to five-month gap between those two things,

21  it doesn't make sense.  And throughout this whole period of

22  time, as you'll see eventually, things were being handled by

23  lawyers in law firms, in conference rooms, being negotiated

24  at arm's length.

25         But the crux of this is really -- and, your Honor,

Case 1:23-cr-00443-FB   Document 105-1   Filed 11/27/23   Page 15 of 27 PageID #: 701

1   you hit the nail on the head and you cut my anticipated

2   argument by about 70 percent with the comments that you made

3   when you first came out.

4           THE COURT:  People usually say good things about

5   the judge.

6           MR. WEINSTEIN:  The reality of it is, even though

7   we dispute the factual allegations and the crimes and the

8   assertions, the reality of it is where the Government has

9   fallen completely short where they have presented zero

10  evidence is that there are not a combination of conditions

11  that can adequately assure the safety of the community.

12          THE COURT:  We're going to talk about that.  Let me

13  toss this back to Mr. Roddin.

14          So I'm a little bit intrigued about the fact that

15  RICO conspiracy, I think the Second Circuit has held that

16  it's not, under the categorical approach, a crime of violence

17  substantively.  But I don't think there's any case that

18  specifically has come down with that same decision vis-à-vis

19  the Bail Reform Act.

20          Am I correct about that.

21          MR. RODDIN:  In fact, Watkins says the opposite

22  more or less.

23          THE COURT:  That's not what we're talking about

24  now.

25          But your position is that you think Watkins stands

*Bail Appeal* 15

1 for the proposition that it's a RICO conspiracy is a crime of

2 violence?

3      MR. RODDIN:  Watkins says that RICO conspiracy is

4 not subject to the same type of challenge that, for

5 example --

6      THE COURT:  That goes back.  But since then, the

7 Supreme Court has spoken out and you have the -- I forget the

8 name of the case -- the Second Circuit has recently spoken

9 about the fact that RICO conspiracy substantively is not a

10 crime of violence.  Why should the same approach be applied

11 to the Bail Reform Act.

12      Is there really a distinction?

13      MR. RODDIN:  I think there is a distinction.  I

14 also think it's sort of a distinction without a difference

15 when we talk about the kind of witness intimidation that went

16 on and what that means for risk of flight even if we were to

17 put aside the question of a crime of violence.

18      THE COURT:  So Mr. Schneider is now going to earn

19 his keep.  He's going to tell me whether or not there should

20 be a distinction, if I'm correct about this, maybe I'm not.

21 But I'm under the impression that RICO conspiracy

22 substantively is not a crime violence but does it apply to

23 the Bail Reform Act differently.

24      What do you see about that?

25      MR. SCHNEIDER:  So I will say this.  The Second

*Bail Appeal*                                                              16

1   Circuit has held that the Residual Clause of the crime of

2   violence definition still holds under the Bail Reform Act.

3   Because like the guidelines, the Bail Reform Act apparently

4   can't be unconstitutionally vague.  So although RICO

5   conspiracy is not a crime of violence under the

6   Elements Test, the Government could try to argue that's it's

7   a crime of violence under that Residual Clause that we all

8   remember being overturned by <u>Johnson</u> and <u>Davis</u> and <u>Taylor</u>.

9        And what <u>Watkins</u> says is that even when applying

10  the Residual Clause now, you have to use the categorical

11  approach.  And quoting from page, I'm not sure what page it

12  is, "You're required to imagine how the idealized, ordinary

13  case of the crime subsequently plays out."

14       My position is the idealized ordinarily use of RICO

15  conspiracy is not necessarily violent.  You can have RICO

16  conspiracy wire fraud --

17       THE COURT:  I think there's law to that effect.

18  What intrigues me is whether that also applies under the Bail

19  Reform Act.  I see no reason why it should not.

20       MR. SCHNEIDER:  Well, for my client, you come out

21  at the same place, right?  The Government cannot make a

22  showing here that there's no combination of conditions that

23  can assure his return to Court.

24       THE COURT:  We have time for that.  What I'm

25  curious, conceptually, is there a nuanced difference between

1    the categorical approach vis-à-vis the substantive RICO

2    conspiracy dynamic as compared to the Bail Reform Act?

3              MR. SCHNEIDER:  Yes.

4              THE COURT:  There is no difference here?

5              MR. SCHNEIDER:  There is a difference.

6              There is a difference because under the Bail Reform

7    Act you still have to consider the Residual Clause that says,

8    any -- whatever it says.  You don't have to do just the

9    Elements Test, you can go to the idealized form of the crime

10   but you still can't look at the facts alleged in this

11   indictment, you have to look at what a RICO conspiracy

12   usually is.

13             THE COURT:  Under the Bail Reform Act, you look at

14   the basic residual clauses you're talking about here.

15             MR. SCHNEIDER:  It's still applicable according to

16   the Court of Appeals but, you know, they've also -- they've

17   never really accepted Davis from the Supreme Court, it always

18   makes them angry.

19             THE COURT:  I just wonder if I should write

20   something about that.  Your clients could care less what

21   we're talking about.

22             So let's talk about, Mr. Roddin, I think under

23   serious crimes, as you say, you give this or that, but that's

24   what the conditions of bail are all about.  I mean, they're

25   not going any place.  We can wrap them up really tight here,

1  they got all sorts of sureters.  I think one is eight, the

2  other has four.  There's 2 million, there's 5 million,

3  there's 10 million, whatever it is.

4          Why is that not sufficient?  I mean, considering

5  that you have overcome the presumption, they seem to have

6  ample, security here.  They seem to have ample constraints on

7  their freedom here.  What do you want to do short of shooting

8  them?

9          MR. RODDIN:  There's two reasons that no conditions

10 are sufficient.  One is their individual means.

11         THE COURT:  Let's talk about that.

12         MR. RODDIN:  Yes.

13         THE COURT:  Slow.  What difference does it make?

14         MR. RODDIN:  The difference that it makes is that

15 they have great ability to relocate and flee somewhere else

16 should they choose to.

17         THE COURT:  They're not allowed to leave their

18 home.  What do you mean they have great ability to relocate?

19         MR. RODDIN:  Judge --

20         THE COURT:  I don't get it.

21         MR. RODDIN:  Because they're --

22         THE COURT:  Whether they're millionaires or not,

23 they're not going to be able to leave their home.

24         MR. RODDIN:  Simply that they aren't allowed to

25 leave their home doesn't mean they won't make some attempt

1   to.  And I think, certainly, when we're talking about a

2   conspiracy --

3        THE COURT:  So you're telling me that wealthy

4   people should never be given their liberty because they have

5   financial means that could possibly give them some more

6   flexibility in terms of living high on the hog?

7        MR. RODDIN:  That is certainly not my argument.  My

8   argument is that, in this case, with these men who are

9   charged in a conspiracy that involved assaults and witness

10  intimidation, it's not going to be enough to say --

11       THE COURT:  You have a better argument than the

12  fact that they're wealthy or one's wealthy?

13       MR. RODDIN:  Yes.  I would point to the fact, and

14  we've belabored in our initial detention memo and again in

15  our response to the bail motions, the bail appeal motions,

16  that the Second Circuit has said we can't have private jail

17  for wealthy defendants and jail for indigent defendants.

18       THE COURT:  So it means all the wealthy people stay

19  in jail, right?

20       MR. RODDIN:  No, Your Honor.  What it means is that

21  in a case where these men are charged with -- I know I keep

22  saying it -- but witness intimidation, among other things.  A

23  conspiracy that resulted in witness intimidation, among other

24  things.  There is serious cause for concern that even under

25  strict conditions and even under home detention, they will

Case 1:23-cr-00443-FB   Document 105-1   Filed 11/27/23   Page 21 of 27 PageID #: 796

*Bail Appeal*                                                    20

1    have access to either their own means or other people's

2    means.

3              THE COURT:  Do you have a better argument?

4              MR. RODDIN:  Your Honor, I think certainly the

5    witness intimidation is a major factor for the Court to

6    consider.

7              THE COURT:  I don't want to be cat and mouse with

8    you, okay?  I've given you every opportunity, it doesn't

9    register with me.  Obviously, I've studied this, I thought

10   about it hard and I've had a lot of cases with Gambinos and

11   you name it, okay?

12             And I'm not giving them any gold stars, but we do

13   have the fact that they're presumed to be at liberty, they

14   should be, they have extremely stringent requirements we're

15   going to impose upon then, monitoring, you name it.  There's

16   going to be a host of things.  There's going to be a couple

17   million dollars that they're going to be at risk of losing if

18   they violate it.  I don't see a history of their violating

19   any conditions here in the past.  I just don't get it, but

20   I'm going to give you your last opportunity to try to

21   convince me because I'm not convinced.

22             MR. RODDIN:  What we're talking about is not just

23   the individual means but the access to the resources of the

24   network, the network people the crime family.  I know the

25   Court is well familiar --

*Bail Appeal*                                                21

1      THE COURT:  What is that all about?  They can be in

2  jail and make phone calls, they can have visitors come.  I

3  don't get that.

4      MR. RODDIN:  That's certainly -- I'm not without

5  concern for that as well.  But when we're talking about the

6  network that they're charged with being part of, there is

7  serious cause for concern that other people's resources may

8  also be brought to bear.

9      THE COURT:  That's always the case in every one of

10  these cases.

11      MR. RODDIN:  I think it's rather a heightened

12  concern.

13      THE COURT:  Why?

14      MR. RODDIN:  From what we're talking about is a

15  crime organization as opposed to a single actor.

16      THE COURT:  Look, I'm pretty much a straight

17  shooter, I don't get.  So I'm going to write a decision in a

18  way or so I guess.  We're going to fine tune the bail

19  conditions.  I got to look at that, I haven't had a chance to

20  do that.  I'll be very stringent with them, no question about

21  it.  There will be something similar to what I did in Campo

22  some years ago.

23      And if you really want to propose to me what you

24  think would be the problem bail conditions do this.  I'm

25  going to let them out, okay, but I want to make sure that we

1   have very stringent bail conditions.  I don't want to give

2   you, the Government, the opportunity to propose to me what

3   you think they ought to be.  And you can do that -- I won't

4   let them out today, you know, maybe by Friday we can do that.

5   But if you can let me know by tomorrow what conditions you

6   want me to consider, I'll certainly give you that respect and

7   do that even though I'm not going to agree with you on the

8   substantive aspects of it, okay?

9              MR. RODDIN:  Understood.

10             THE COURT:  And I think you've already spoken about

11  your bail conditions.  Is there anything else you want to

12  submit to me about what you think I should consider?

13             MR. SCHNEIDER:  I do.

14             First of all, Judge, I want to point out that

15  courts are going to be closed on Friday.  I don't think

16  there'll be a duty magistrate, there might be one on duty

17  Saturday just for the Court's information.

18             THE COURT:  Maybe I can do it by tomorrow.

19             MR. SCHNEIDER:  Okay.

20             THE COURT:  Here's what I'm thinking.

21             We all have a human aspect to us, even people who

22  have had not the same privileges that we have had and have

23  led a different type of life which I do not approve of.  But

24  we're going to have Thanksgiving on Thursday, maybe I should

25  try to let them out tomorrow.

1    MR. SCHNEIDER:  So the only point I would make, and

2    I will write it today and send it to court if you want, is

3    that there's no real difference between my client and the

4    five co-defendants who were released.  The bond in all those

5    cases was a million dollars which is what I'm asking for.

6    And for four of them there's home detention which I don't

7    object to.  So I think that a bond along those lines is

8    appropriate for my client.  He is actually charged -- he's

9    the least charged among those defendants.

10          THE COURT:  Can you do this before the duty

11   magistrate tomorrow to make sure that the sureters are in

12   place and we know all the Ts are crossed and the Is dotted.

13          MR. SCHNEIDER:  If you issue an order giving the

14   parameters of the bond, we can schedule this before the duty

15   magistrate who can sign the bond.

16          THE COURT:  Maybe I can do that today in the next

17   two hours.  Come down with some order to give you some

18   general parameters.  Go to the duty magistrate and submit to

19   him or her whatever the bail conditions you think should be

20   imposed.

21          Does that make sense?

22          MR. SCHNEIDER:  I think so.

23          MR. WEINSTEIN:  That's fine.  My client's entire

24   people, all the proposed signers, are here.

25          THE COURT:  I can't manage that, I can't process

*Bail Appeal*                                    24

1   that.  If you want to, within the next hour or so, I know

2   it's putting some pressure on you, I know it's a holiday.

3   Just send it to me what you think the bail conditions ought

4   to be from your perspective.  I maybe able to bless them or

5   maybe the two of you can all -- the three of you could all

6   get together and propose something to me.

7             Is that possible?

8             MR. RODDIN:  I think we may need a bit more than

9   hour for that, Judge.  I'll certainly want to consult with

10  members of my office to talk about proposed conditions, but

11  we'll have something filed as quickly as possible, certainly.

12            THE COURT:  Why don't you try because we have the

13  holiday.  Why don't you try to, all three of you, talk now.

14  It's 3:00, you can do it between 3:00 and 5:00 and see if you

15  can some to some collectively sense of the parameters for the

16  bail package that you can sent it to me.  And if not, you can

17  tell me where you disagree and I'll try to cut an order by

18  the end of today or first thing tomorrow morning.  Say to the

19  duty magistrate, let these people go home for Thanksgiving,

20  that's what we're trying to do.

21            Does that make sense?

22            MR. WEINSTEIN:  Yes.

23            MR. SCHNEIDER:  Yes.

24            THE COURT:  Report back to me at 5:00 o'clock.  Let

25  me know where you're at.

*Bail Appeal*                                                    25

1          MR. SCHNEIDER:  I'm going to busy in the morning,

2     so I'm going to ask the duty magistrate to call

3     Mr. Gradilone's case at 2:00 o'clock.  I ask the marshals to

4     bring my client back tomorrow.

5          Thank you.

6          THE COURT:  I'm sorry, you passed this by me

7     quickly.  You want what?

8          MR. SCHNEIDER:  I want to make sure the marshals

9     bring Mr. Gradilone back tomorrow from the MDC.

10         THE COURT:  I think they both have to come back

11    tomorrow.

12         MR. SCHNEIDER:  I don't want to step on his toes.

13    He has a client.

14         THE COURT:  Can the marshals bring them both back

15    tomorrow, is that doable?  Because we have pressure with the

16    holiday season now.  We're going to try to get this done.

17         So be back tomorrow.  I'll hear from you by

18    5:00 o'clock, hear your thoughts on it, cut an order.

19         Anything else I can do for you today?

20         MR. WEINSTEIN:  No, Your Honor.

21         MR. SCHNEIDER:  No thank you.

22         THE COURT:  One final word.  I really respect your

23    position but I'm very direct and very candid when I talk to

24    both parties.  I think that you have my sense of things and I

25    don't see any real risk of flight and I think that the proper

1  bail package can cover whatever concerns you have about their

2  wealth or making phone calls and stuff like.

3          That my take, okay?

4          MR. RODDIN:  Understood.

5          THE COURT:  Keep up the good work.  See you later.

6          MR. WEINSTEIN:  Thank you.

7          MR. SCHNEIDER:  Thank you.

8          (Defendant exits from courtroom at 3:14 p.m.)

9          (WHEREUPON, this matter was adjourned.)

10

11                          *   *   *

12

13                  <u>CERTIFICATE OF REPORTER</u>

14

I certify that the foregoing is a correct transcript of the
15  record of proceedings in the above-entitled matter.

16

17

18

19

20  _____
    Anthony D. Frisolone, FAPR, RDR, CRR, CRI
21  Official Court Reporter

22

23

24

25