# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X  Docket#
UNITED STATES OF AMERICA,      : 23-cr-00443-FB-3,8,9,10
                               :
                               :
  - versus -                   : U.S. Courthouse
                               : Brooklyn, New York
JOSEPH LANNI, et al.,          :
                               : November 8, 2023
         Defendants            : 4:47 p.m.
------------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR ARRAIGNMENT
BEFORE THE HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE

**A  P  P  E  A  R  A  N  C  E  S:**

**For the Government:**          **Breon S. Peace, Esq.**
                                 United States Attorney

                        BY:     **Matthew Galeotti, Esq.**
                                **Anna Karamigios, Esq.**
                                **Andrew Roddin, Esq.**
                                 Assistant U.S. Attorneys
                                 271 Cadman Plaza East
                                 Brooklyn, New York 11201


**For Def. Brooke:**            **Vincent Martinelli, Esq.**




            (Appearances continue on next page)




**Transcription Service:**      **Transcriptions Plus II, Inc.**
                                 61 Beatrice Avenue
                                 West Islip, New York 11795
                                 RL.Transcriptions2@gmail.com




Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

**APPEARANCES CONTINUED**

**For Def. Minsquero**:      **Louis Gelormino, Esq.**


**For Def. Rappa**:      **Wayne E. Gosnell, Esq.**
Clayman Rosenberg Kirshner &
 Linder LLP
305 Madison Avenue, Suite 650
New York, NY 10165


**For Def. Vicari**:      **Eylan Schulman, Esq.**
Moskowitz Colson Ginsberg &
 Schulman LLP
80 Broad Street, Suite 1900
New York, NY 10004

Proceedings

3

1    THE CLERK:  So we have Criminal Cause for an

2    Arraignment on an indictment.  It's 23-cr-443, *United*

3    *States v. Vito Rappa.*  We have Robert Brooke, Francesco

4    Vicari, and Vincent Minsquero.

5    Counsel, state your appearances, please,

6    starting with the government.

7    MR. GALEOTTI:  Good afternoon again, your

8    Honor.  For the government, Assistant United States

9    Attorneys Matthew Galeotti, Anna Karamigios, and Andrew

10   Roddin.

11   THE COURT:  Good afternoon.

12   MR. GOSNELL:  Wayne Gosnell from the Law Firm

13   of Clayman Rosenberg Kirshner & Linder here on behalf of

14   Mr. Rappa who's to my right.

15   THE COURT:  Good afternoon.

16   MR. MARTINELLI:  Good evening, all.  Good

17   evening, counsel.  For Mr. Brooke, Vincent Martinelli.

18   THE COURT:  Good afternoon.

19   MR. SCHULMAN:  Good afternoon, your Honor.

20   Eylan Schulman on behalf of Francesco Vicari with

21   Moskowitz Colson Ginsberg & Shulman.

22   THE COURT:  Good afternoon.

23   MR. GELORMINO:  On behalf of Mr. Minsquero,

24   Louis Gelormino.  Good afternoon, your Honor.

25   THE COURT:  Good afternoon.  Mr. Rappa, Mr.

4

Proceedings

1  Brooke, Mr. Vicari, and Mr. -- is it Minisquero?

2           DEFENDANT MINSQUERO:  Minsquero.

3           THE COURT:  Minsquero.  Mr. Minsquero.  You're

4  here today because a grand jury has returned an

5  indictment against you charging you each with certain

6  crimes.

7           Mr. Rappa, you are charged in Count 1 with

8  racketeering conspiracy; Counts 2 and 3, with Hobbs Act

9  extortion and conspiracy; and Counts 13 with theft from

10  an employee benefit plan.

11           Mr. Brooke, you are charged in Counts 7 and 8

12  with Hobbs Act extortion and conspiracy;

13           Mr. Vicari, you are charged in Count 1 with

14  racketeering conspiracy and Counts 2 and 3 with Hobbs Act

15  extortion and conspiracy.

16           You have the right to remain silent.  You do

17  not have to make a statement to anyone.  If you start to

18  make a statement, you can stop at any time.  If you've

19  made statements in the past, you are not required to make

20  statements in the future.  Any statements that you do

21  make can and will be used against you in your case except

22  for statements that you make to your attorney.  Those are

23  privileged.

24           Mr. Rappa, do you understand?  I need to hear

25  you.

5

Proceedings

1              DEFENDANT RAPPA:  Yes, yes.

2              THE COURT:  Mr. Brooke, do you understand?  I

3    need to hear you.

4              DEFENDANT BROOKE:  Yes, I do.

5              THE COURT:  Okay.  Mr. Vicari, do you

6    understand?

7              DEFENDANT VICARI:  Yes, I do.

8              THE COURT:  And Mr. Minsquero, do you

9    understand?

10             DEFENDANT MINSQUERO:  Yes, your Honor.

11             MR. GELORMINO:  Your Honor, if I may quickly?

12   You didn't outline the case against my client, the

13   charges against him.

14             THE COURT:  I did not?

15             MR. GELORMINO:  Yeah.

16             THE COURT:  I apologize.  I am sorry.

17             MR. GELORMINO:  I just wanted to -- that's

18   okay.

19             THE COURT:  It's been a long day.  Mr.

20   Minsquero, you are charged in Count 1 with racketeering

21   conspiracy and Count 15 with witness retaliation.

22             MR. GELORMINO:  Thank you, your Honor.

23             THE COURT:  Gentlemen, you also have the right

24   to be represented by attorneys throughout your case.  I

25   believe each of you has retained counsel.  And if at some

6

Proceedings

1    point in time you can't afford to keep them as your

2    lawyer, just let me know, or let the court know, and if

3    you're eligible financially, we will appoint an attorney

4    to represent you.  Okay?

5               I apologize.  I'm sorry.  Mr. Minsquero, you

6    have submitted a financial affidavit as has Mr. Rappa.  I

7    don't see -- oh yep, there's also one for Mr. Vicari.

8    And is there one for Mr. Brooke?

9               MR. MARTINELLI:  No, Judge.

10              THE COURT:  No.  So Mr. Brooke has retained

11   counsel.

12              MR. MARTINELLI:  That's correct.

13              THE COURT:  Mr. Brooke, if at some point in

14   time you can't afford to keep him as your lawyer, let us

15   know, and if you're eligible financially, we'll appoint a

16   lawyer to represent you.

17              MR. GALEOTTI:  Your Honor, if I may?  The

18   government understands Mr. Minsquero is also represented

19   by retained counsel.

20              MR. GELORMINO:  I was actually just going to

21   say that, your Honor.  I appreciate the people jumping

22   in.

23              THE COURT:  Okay.  But I have a financial

24   affidavit.

25              MR. GALEOTTI:  The same applies for Mr. Rappa.

7

Proceedings

1          THE COURT:  Okay.  And Mr. Vicari also or no?

2          MR. SCHULMAN:  No, your Honor.  I am appointed

3    pursuant to the Criminal Justice Act.

4          THE COURT:  Thank you.  Same thing goes for

5    you, Mr. Minsquero and you, Mr. Rappa.  If you can't

6    afford them going forward, ask the Court to appoint an

7    attorney to represent you and if you're eligible

8    financially that'll happen.

9          Now Mr. Vicari, I have a financial affidavit

10   that you submitted.  It's got a signature at the bottom.

11   Is that your signature?

12         DEFENDANT VICARI:  Yeah.

13         THE COURT:  Based on the information contained

14   in Mr. Vicari's financial affidavit, I find that he is

15   entitled to court-appointed counsel and I'll appoint Mr.

16   Schulman to represent him.

17         DEFENDANT VICARI:  Thank you.

18         THE COURT:  Mr. Minsquero, have you been given

19   a copy of the indictment?

20         DEFENDANT MINSQUERO:  Yes, your Honor.

21         THE COURT:  And have you discussed the charges

22   with your attorney?

23         DEFENDANT MINSQUERO:  Yes, your Honor.

24         THE COURT:  You understand the charges?

25         DEFENDANT MINSQUERO:  Yes.

8

Proceedings

1       THE COURT:  Counsel, do you want me to read the
2   indictment aloud?
3       MR. GELORMINO:  No, I'll waive the public
4   reading and plead not guilty on behalf of my client.
5       THE COURT:  Okay.  Mr. Vicari, have you
6   received a copy of the indictment?
7       DEFENDANT VICARI:  Yeah.  Yes.
8       THE COURT:  And have you discussed the charges
9   with your attorney?
10       DEFENDANT VICARI:  Yes.
11       THE COURT:  You understand the charges?
12       DEFENDANT VICARI:  Yeah.
13       THE COURT:  Mr. Schulman, do you want me to
14   read the indictment aloud?
15       MR. SCHULMAN:  No.  Thank you, your Honor.  We
16   waive a public reading and we ask that the Court enter a
17   plea of not guilty to the three charges against Mr.
18   Vicari.
19       THE COURT:  Mr. Brooke, have you received a
20   copy of the indictment?
21       DEFENDANT BROOKE:  Yes.
22       THE COURT:  Have you discussed the charges with
23   your attorney?
24       DEFENDANT BROOKE:  Yes.
25       THE COURT:  You understand the charges?

9

Proceedings

1    DEFENDANT BROOKE:  Yes, I do.

2    THE COURT:  Do you want me to read the

3 indictment aloud?

4    MR. MARTINELLI:  No, Judge.  Thank you.  I too

5 waive its public reading, plead not guilty on Mr.

6 Brooke's behalf.

7    THE COURT:  And Mr. Rappa, did you receive a

8 copy of the indictment?

9    DEFENDANT RAPPA:  Yes.

10    THE COURT:  Did you discuss the charges with

11 counsel?

12    DEFENDANT RAPPA:  Yes.

13    THE COURT:  Do you understand the charges?

14    DEFENDANT RAPPA:  Yes.  Thank you.

15    THE COURT:  Would you like me to read the

16 indictment aloud?

17    MR. GOSNELL:  No, your Honor.  We waive that

18 and we would ask that you enter a not guilty plea on his

19 behalf to these charges.

20    THE COURT:  Okay.  Gentlemen, on behalf --

21 excuse me.  I apologize.  Under the constitution and laws

22 of the United States, you are entitled to a speedy jury

23 trial that has to take place within 70 days of the date

24 of your indictment.  If the government fails to bring you

25 to trial in 70 days, that could be the basis for a motion

Proceedings

10

1    to dismiss the indictment.  And if you would be

2    successful in making such a motion, the indictment would

3    be dismissed and no charges would go forward against you.

4            I've been given applications that I believe are

5    signed by each of you that seek to exclude from today

6    through December 8th from the 70-day period in which you

7    must be brought to trial.  And the purpose for that

8    exclusion of time from these applications that I've been

9    given is because you're engaged in plea negotiations with

10   the government that may lead to a disposition of your

11   case without the need for a trial and I presume because

12   your attorneys need time to review the discovery that's

13   going to be produced by the government in this case.

14           Is there anyone here who disagrees with that?

15           MR. MARTINELLI:  No, Judge.  On behalf of Mr.

16   Brooke, we consent.

17           THE COURT:  Okay.

18           MR. GELORMINO:  As do we on behalf of Mr.

19   Minsquero.

20           MR. GOSNELL:  As do I on behalf of Mr. Rappa.

21           MR. SCHULMAN:  And similarly for Mr. Vicari,

22   yes, your Honor.

23           THE COURT:  Is there anyone who has been

24   threatened, forced, or pressured to agree to this

25   exclusion of time.

11

Proceedings

1        MR. MARTINELLI:  No, Judge.

2        THE COURT:  Okay.  I'll take the silence as no.

3        All right.  I will sign orders of excludable

4   delay for all of the defendants finding that it's in the

5   interest of justice, the public, and each of the

6   defendants as well.

7        Mr. Galeotti, can you state for the record that

8   the government understands its obligations under *Brady v.*

9   *Maryland* and will fulfill them?

10       MR. GALEOTTI:  We do, your Honor, and we'll

11  review the order you've issued pursuant to 5(f) in this

12  case and we can confirm that we will comply with our

13  obligations.

14       THE COURT:  Just so you know, gentlemen, *Brady*

15  *v. Maryland* is a Supreme Court case that says the

16  government has to turn over to you any evidence that is

17  exculpatory, that indicates that you are not responsible

18  or not liable for these actions.  And they have to do

19  that promptly.  So Mr. Galeotti, on behalf of the

20  government, will make sure that that happens in this

21  case.

22       MR. MARTINELLI:  Your Honor, has that been

23  filed on ECF?

24       THE COURT:  If it hasn't been filed already on

25  ECF, it will be filed by the end of the day, but we

Proceedings                                    12

1   mentioned it in both of the other arraignments with these

2   gentlemen's co-defendants.

3              And again, there's a conference with Judge

4   Block on the 8th of December at what time?

5              THE CLERK:  2:30.

6              THE COURT:  2:30.  Thank you.

7              MR. GALEOTTI:  That's correct, your Honor.

8   Thank you.

9              THE COURT:  You gentlemen received the

10  government's detention memo, correct?

11             ATTORNEY:  Yes, your Honor.

12             THE COURT:  All right.  What I'd like to do is

13  hear from the government about each defendant

14  individually and why the government believes they should

15  be detained because as I read the detention memo and read

16  the indictment, some of these folks are not situated the

17  same as the other two people we just had a detention

18  hearing on.

19             MR. GALEOTTI:  Understood, your Honor.

20             MR. MARTINELLI:  That's correct.

21             MR. GALEOTTI:  Your Honor, we'll speak first

22  with respect to Mr. Rappa and Mr. Vicari, and Mr. Roddin

23  will speak to Mr. Minsquero and Mr. Brooke.

24             Your Honor, first I'd like to put on the record

25  the reasons and the provisions under which we are seeking

Proceedings

13

1   detention with respect to Mr. Rappa and those are 18

2   United States Code Sections 3142 (f)(1)(A), because the

3   defendant is charged with a crime of violence, as well as

4   pursuant to 18 United States Code 3142(f)(2), provisions

5   (A) and (B).

6           First that it's a serious risk that he will

7   flee.

8           And second, he's a serious risk that the

9   defendant will obstruct justice or interfere or injure

10  other victims or witnesses.

11          Your Honor, Mr. Rappa is a member of the

12  Sicilian mafia and he's an associate of the Gambino crime

13  family.  Today, based on a coordinated takedown with the

14  U.S. and Italian authorities, Mr. Rappa's father was

15  arrested in Italy.

16          Mr. Rappa has been part of the Gambino, an

17  associate of the Gambino crime family for a lengthy

18  period of time.  He's been the right-hand man of Danny

19  Tantillo, a defendant who we spoke about earlier, for

20  quite some time.  And he engaged in a violent extortion

21  at the behest of Danny Tantillo.

22          In particular, Mr. Rappa went out and

23  threatened John Doe 1's associates, close associates.

24  Mr. Vicari and Mr. Rappa went to individuals and picked

25  up a knife in one instance and forced them, or suggested

14

Proceedings

1    quite seriously with the knife in their hand that that
2    individual should get John Doe 1 to make a payment and to
3    cut him in two in their words.

4              Mr. Rappa would often relay those violent
5    threats back to Mr. Tantillo.  Mr. Rappa would also
6    coordinate pickups of extortionate payments from victims
7    on behalf of Mr. Tantillo.  Mr. Rappa, as we outlined in
8    the detention memo, conversed with Mr. Tantillo regarding
9    the activities of the Gambino crime family including Mr.
10   Tantillo's making ceremony.  He is an insider as close as
11   there can be without being made into this Gambino crime
12   family.  He has access to the individuals.  He has access
13   to the resources of the enterprise.

14             He engaged in a violent extortion on behalf of
15   the enterprise which has two parts, your Honor.  As you
16   know by now, it's extortion of John Doe number 1, which
17   also resulted in the assault of another victim whose
18   picture we put under seal who was assaulted with a
19   hammer.  Mr. Rappa was involved in both of those
20   extortions in connection with his association with the
21   Gambino crime family, and in particular Mr. Tantillo.

22             I'd also note that with respect to a serious
23   risk that the defendant will flee, the defendant has
24   significant ties to Italy.  As we mentioned, he has
25   family members overseas including his father who's a

15

Proceedings

1  member of the Sicilian maffia.  He has other ties and
2  other family members in Italy, and he has access to
3  resources in Italy as well as in the United States.
4          He's now facing significant penalties.  The
5  evidence against him is overwhelming.  It includes
6  wiretaps, recordings, text messages, phone records,
7  geolocation data, and other information which makes the
8  case against him incredibly strong and it increases the
9  likelihood that he will face those severe penalties.
10          So for all of those reasons, your Honor, the
11  government submits that Mr. Rappa is both a danger to the
12  community and a risk of flight.
13          MR. GOSNELL:  Thank you, your Honor.  If it
14  pleases you, I think --
15          THE COURT:  You can --
16          MR. GOSNELL:  -- it makes sense for us to go
17  sort of in order.
18          THE COURT:  I think so.
19          MR. GOSNELL:  Okay.  So a couple of just sort
20  of factual issues.  One, the recitation by the AUSA seems
21  to be at odds with their detention memo and some of it is
22  maybe just, you know, the incorrect language, but he
23  indicated that there were multiple associates of John Doe
24  1 that Mr. Rappa was allegedly involved in threatening.
25  The memo indicates there's one.

16

Proceedings

1        But more specifically, what it seems like from

2    reading their memo is what is alleged is that on one day

3    some time about three years ago Mr. Rappa is alleged to

4    have sent a text message.  At another date, again almost

5    three years ago, he's alleged to have engaged in verbal

6    threats and then sends a text after that.  That is the

7    extent of his involvement from their detention memo as to

8    that particular extortion scheme and any violence with

9    respect to him.

10        I think that Mr. Rappa is in a very different

11   position than many of the other defendants that you've

12   already heard about.  In particular, if you look at the

13   Pretrial Services memo with respect to Mr. Dilorenzo, who

14   the government conceded there are conditions that can be

15   met, Pretrial Services in this case with Mr. Rappa,

16   knowing all about the other defendants and knowing about

17   Mr. Dilorenzo, knowing about Mr. Tantillo, knowing about

18   the government's theory, recommends Mr. Rappa for

19   release.  They believe that there are conditions that

20   could be met that he can abide by which he will come back

21   to court and will not be a danger to the community.

22        And while that certainly is not binding on your

23   Honor, this Court I believe should give significant

24   weight to their assessment that they believe there are

25   conditions that can be met.

Transcriptions Plus II, Inc.

17

Proceedings

1          And in fact, the conditions that they believe
2    are sufficient or less onerous than the conditions that
3    they recommended for Mr. Dilorenzo.  Mr. Dilorenzo I
4    believe they recommended a substantial secured bond.
5    They don't recommend a substantial bond with respect to
6    Mr. Rappa.  They recommend a moderate bond.  They don't
7    recommend that it be secured.
8          His wife is here.  She certainly could cosign
9    as a financially responsible suretor.  Mr. Rappa would be
10   a financially responsible suretor.  They have a home in
11   New Jersey with approximately $1.5 million in equity that
12   could be posted if the Court deemed that there was a
13   necessity for the securitization of a bond.
14          THE COURT:  You said it has 1.5 million in
15   equity?
16          MR. GOSNELL:  I believe it's -- sorry.  It's
17   worth 1.5 million.  There is no mortgage.
18          THE COURT:  And it's got 1.5 million in equity.
19          MR. GOSNELL:  There's a slight credit line
20   associated with the house that I think is about $30,000.
21          THE COURT:  All right.
22          MR. GOSNELL:  So approximately 1.5 million.
23          And I would also point out that all of the
24   arguments that the government made here were made
25   essentially word for word in 2007 when Mr. Rappa was

18

Proceedings

1  arrested and they sought detention against him in another

2  matter essentially with very similar facts in terms of

3  their allegations about him being an associate of the

4  Gambino crime family, about witness tampering or doing

5  things of that nature.

6          Judge Dearie found that there were conditions

7  that could be met.  In fact, I believe the bond was

8  $300,000 unsecured.  And Mr. Rappa proved that he can

9  show up for court, proved that he is not a flight risk,

10 and proved that he is not a danger to the community.  He

11 showed up for court.  He did everything that was asked of

12 him.  He pled guilty.  He was sentenced to probation, all

13 of which without incident.

14         And so if the Court is looking for some

15 assurance that he can do what the Court would require him

16 to do while on pretrial release, it has that.  He's done

17 it before.

18         And I don't want to belabor the point made by

19 the prior lawyers about the distance in time between the

20 execution of search warrants or generally the allegations

21 against Mr. Rappa, but there is a significant period of

22 time between the allegations of alleged violence in the

23 detention memo or in the indictment and today.  And the

24 question isn't was Mr. Rappa potentially a threat to

25 someone at some point in the past.  It's whether or not

19

Proceedings

1  he presents a clear risk of danger to people now.  I

2  don't think that there's any evidence about that

3  whatsoever in their detention memo or in their

4  presentation today.

5        I believe there are conditions that can be met.

6  I've suggested a particular bond.  And all of the other

7  conditions that are suggested by Pretrial, we would have

8  no problem abiding by those if the Court were to order

9  them.

10        And so what I am suggesting, your Honor, is

11  that you order his release based on the signatures today

12  of himself and his wife who would be a financially

13  responsible co-suretor, that you require him to post a

14  secured bond of whatever amount your Honor determines by

15  next Wednesday as you did with Mr. Dilorenzo.  And if the

16  Court requires any additional suretors, we can also have

17  that in place by next Wednesday.

18        One additional thing is is that Mr. Rappa does

19  suffer from severe asthma.  His medications are listed in

20  the Pretrial Services report on the bottom of page 2.  He

21  did have a severe asthma attack last week where he was

22  seen and treated at a hospital.  This is a very serious

23  condition for him.  And I'm sure that the Court is very

24  familiar with the medical issues or the issues that are

25  attendant to MDC with detainees there and them getting

20

Proceedings

1   proper medical care.

2          MR. GALEOTTI:  If we could very briefly

3   respond, your Honor?

4          THE COURT:  Yes.

5          MR. GALEOTTI:  Your Honor, first and foremost,

6   I would just point out, as your Honor well knows, that

7   the government can proceed by proffer at this stage.

8   We've chosen not to by submitting a lengthy detention

9   memo which outlines what is illustrative of the kinds of

10  crimes that have been committed in this case.  In no way

11  or form should this be interpreted to mean that this is

12  what is exclusive of the evidence in this case.

13         So there are innumerable wiretaps with Mr.

14  Rappa discussing with Mr. Tantillo putting pressure on,

15  turning multiple individuals in connection with this case

16  and in separate extortion schemes.  So let me just say

17  that for starters.

18         Second, with respect to the 2007 incident that

19  defense counsel addressed, the government would submit

20  that actually this cuts the other way.  This defendant

21  has already been charged and convicted with this kind of

22  crime and has continued to engage in it despite knowing

23  that he's previously been convicted of it.

24         Second, in 2007 Mr. Rappa also tried to bribe a

25  federal official which goes to the point that we've been

21

Proceedings

1  making consistently which is that individuals associated

2  with organized crime do have the means and ability to

3  engage in tampering and other forms of obstruction.  This

4  defendant in particular has done it before.

5           And finally, your Honor, just because this

6  defendant to emphasize is not a made member of the

7  Gambino crime family, he is a member of the Sicilian

8  Mafia.  He is no different than Angelo Gradilone, for

9  example.  In fact, this defendant engaged in at least one

10 of the violent extortions which are outlined in detail in

11 the detention memo and the indictment.

12          So your Honor, we submit that he is a danger to

13 the community.

14          THE COURT:  Okay.  Let's move on to Mr.

15 Brooke.

16          MR. RODDIN:  As an initial matter, your Honor,

17 as to Mr. Brooke, the government is moving for detention

18 on the same two grounds, Title 18 United States Code

19 3142(f)(1)(A) because the defendant is charged with a

20 crime of violence, and 3142(f)(2)(A), serious risk that

21 the defendant will flee, as well as (f)(2)(B), a serious

22 risk that the defendant will obstruct justice or threaten

23 to injure a witness or victim in this case.

24          As we outlined in the detention memorandum, Mr.

25 Brooke has a pretty serious criminal history, albeit an

22

Proceedings

1  old one.  He has a prior 924(c) conviction for possessing
2  a firearm in relation to a crime of violence.  The crime
3  of violence was a Hobbs Act robbery of which he was also
4  convicted, along with a conviction for transportation of
5  stolen property.
6          He also participated in an incredibly violent
7  assault in furtherance of an extortion scheme of the
8  extortion of demolition company 1 as well as John Doe 20
9  is a victim of the assault itself.  Your Honor has seen
10 the photos submitted as Exhibit 1 to the memorandum.  It
11 was a serious beating.  This was an incredibly violent
12 assault to try to get money from these people.
13         So it's the government's position that based
14 both on that serious criminal history as well as the
15 serious violence that he's alleged to have more recently
16 participated in, Mr. Brooke represents a danger to the
17 community.
18         For the same reasons related to the Gambino
19 crime family that we've been discussing all afternoon,
20 it's also the government's position that as an associate
21 of the Gambino family, defendant Brooke presents a risk
22 of flight, witness intimidation, and of witness
23 tampering.  I won't belabor those points any farther
24 beyond what Mr. Galeotti has outlined a few moments ago
25 about the resources of the organization.

23

Proceedings

1      MR. MARTINELLI:  Your Honor, if I may use the

2  podium as well?

3      THE COURT:  Sure.

4      MR. MARTINELLI:  And I'm going to start from

5  the outset by saying the reason being is I have a similar

6  cough that you do.  It's much easier to talk standing up.

7  Sinus infection, chest infection.  I'm on Augmentin, so I

8  feel you.

9      THE COURT:  Okay.

10      MR. MARTINELLI:  It's interesting, Judge, that

11  the government relies on proceeding by proffer but they

12  are misleading the Court in that proffer and they know

13  it.  Misleading the Court here is almost horrific.  Mr.

14  Burke is not charged with the racketeering conspiracy.

15  He's the only defendant not so charged.  I don't know

16  anybody that would ever accuse my client, this is the

17  first I've ever heard of this, and I tracked his former

18  case very closely.  It started before I became a lawyer

19  in 1992.  And I helped him with that case while I was in

20  law school.  I didn't help him good enough, but I helped

21  him.  I don't know anybody that would accuse him as being

22  associated with the Gambino crime family.

23      But more importantly, Judge, aside from being

24  the only defendant here, and as you pointed out, there

25  are some people here not similarly situated to the

24

Proceedings

1  previous defendants, aside from that, the government's
2  misleading your Honor in its proffer.  There was a 343,
3  which is known as a state dismissal, of this alleged
4  assault incident.
5          Now let me backtrack.  Mr. Brooke, and you've
6  highlighted it, is only charged with one standalone
7  extortion.  I'll call it an assault for now.  Okay?  Just
8  for now.  November of 2019 through January of 2021.  The
9  issues with the extortion go to nine other people from
10  prior to that and long thereafter that that Mr. Brooke is
11  not involved in.
12          In essence, he was at the wrong place at the
13  wrong time that had a business dispute with somebody from
14  Waldorf Carting.  He parked in the same lot with Waldorf
15  Carting's I guess owner every day, the same parking lot.
16  Waldorf Carting owed him 140,000, $110,000, not 40 that's
17  listed in the detention memo.  They settled for 11.  A
18  lawyer handled that lawsuit.  The government knows this.
19  Peter Christiansen.  Or should know of it.  The 343 was
20  from Manhattan New York City Police Department.  And I
21  would only presume is because the video evidence shows
22  Mr. Marone from Waldorf Carting attacking Mr. Brooke in
23  the parking lot and Mr. Brooke defending himself.
24          I've seen the picture.  The picture does not
25  give me -- and I don't mean to minimize anybody's

25

Proceedings

1    injuries.  I'm not here to poo poo injuries, Judge.  The

2    picture is a bloody forehead.  Okay?

3              THE COURT:  Swollen eye.

4              MR. MARTINELLI:  There were no weapons

5    involved.  And to me does not look serious.  I've looked

6    at it.  Okay?

7              But more to the point it's a standalone

8    incident that the New York City Police Department

9    Manhattan DA's Office decided to 343.  There was a lawyer

10   involved from Queens County, Peter Christiansen.  And the

11   case was not prosecuted.  Okay?  I think it's very

12   important here no activity prior to that with the other

13   nine people.  No activity after that with the other nine

14   people.  A standalone incident for a $110,000 business

15   dispute where I would argue that the evidence would show

16   that Mr. Brooke was attacked and defended himself.  And

17   it was a simple, simple, small time issue, Judge.  Again,

18   case 343.

19             Moving to the issues of moral suasion, Judge,

20   I've known Mr. Brooke for my entire 57 years.  He's a

21   year younger than me, so I know him for 56 years.  Our

22   families grew up together.  I was raised not too far from

23   where he lived.  Our fathers were best friends.  They

24   shared businesses together.  As I said, I was involved as

25   a law student with his previous case.  He was detained

26

Proceedings

1    pending trial.  He saw a trial in that case.  He disputed

2    the charges.  He was found guilty unfortunately.  He was

3    released in 2006 and had no issues from 2006 till today

4    including his supervised release which ended in

5    approximately 2009.

6              He's owned two businesses since then, Special

7    Concrete Cutting, which provides the cutting of concrete

8    and demolition of buildings, and Robo Breaking, as in you

9    break concrete.  They break them with robots.  The

10   Specialized Concrete Cutting he had for about six years.

11   I think that's what they're going to say the dispute was

12   over the $110,000.  They claim 40 in the paperwork.  It

13   was settled with lawyers for 11.

14             By the way, Judge, when the case was settled,

15   Waldorf Carting was under federal monitorship and Mr.

16   Brooke walked into the office allegedly after the

17   incident and collected his $11,000 that they offered him.

18   In essence, ten cents on the dollar for $110,000.

19             In addition, Judge, and this is the most

20   salient point, he's done work for the same individual he

21   is accused of assaulting at least two times thereafter

22   requested by that individual.  Begged him to bring his

23   machines to the job.  Mr. Brooke, will you please bring

24   your machines to the job?  Okay?  You're the only one

25   that does Robo breaking.  You're the only one that works

27

Proceedings

1  60 to 80 hours a week that we need cutting concrete.  You

2  show up on the job yourself.  He's got 14 men to employ.

3  His fiancée, who is seated in the back seat, she's from

4  Bangladesh, he's been with her for eight years.  My

5  girlfriend, and we go out as couples.  Her father is

6  willing to post their house in Staten Island.  It is in

7  the Annadale section of Staten Island.  It's worth

8  approximately $700,000.  I believe it has a small

9  mortgage.

10          I would propose, Judge, and what's happened

11 here is, aside from misleading on the proffer as to this

12 business issue with an assault where Mr. Brooke was the

13 one that was attacked, aside from that misleading

14 proffer, I would argue that he's been in business for

15 seven years, or two years thereafter, and he's been used

16 by this company twice specifically, the last time last

17 Christmas.  Okay?

18          Ms. Puha (phonetic) I believe is her name, owns

19 51 percent of the company, the new company, Robo

20 Breaking.  It's a minority company.  Mr. Brooke has a

21 small business loan of about $1.8 million he used to

22 found that company.  The two companies are worth about

23 3.5 million, 2.6 for Robo Breaking and about 900,000 for

24 Specialized Saw Cutting.

25          THE COURT:  And you said that Mr. Brook's

28

Proceedings

1  fiancée's name is what?

2          MR. MARTINELLI:  I know her first name, it's

3  Farjana, F-A-R-J-A-N-A.  She spelled it for me but it's

4  different than that.  Do you want to spell it, Farjana?

5          MS. It's F-A-R-J-A-N-A, and last name is

6  P-U-Z-A.

7          MR. MARTINELLI:  P-U-Z-A.  Okay.

8          THE COURT:  Okay.  So you say that Ms. Puza's

9  father is willing to post his house?

10          MR. MARTINELLI:  Yeah, father and mother,

11  Judge.  They're on the deed together.  They're from

12  Bangladesh.  They live in Staten Island for two years

13  now.

14          THE COURT:  Are they here?

15          MR. MARTINELLI:  They're not here today.  They

16  were working, Judge.

17          THE COURT:  Okay.  So you propose --

18          MR. MARTINELLI:  A $1 million bond secured by

19  one house in Staten Island signed by three people, Ms.

20  Puza and her parents.

21          THE COURT:  And the other suggestions from

22  Pretrial Services?

23          MR. MARTINELLI:  Your Honor, I would agree to

24  everything.  I don't think there's a need for the

25  electronic monitoring.  I certainly would agree with it.

29

Proceedings

1  Mr. Brooke works his own jobs.  He works 60 to 80 hours a

2  week.  Sometimes he comes to my house.  He was at my

3  house Friday dropping off wine at like 12 at night with

4  his truck, his big dump truck.  So I would ask that he be

5  allowed to go to work, Judge.

6          THE COURT:  Well, electronic monitoring doesn't

7  preclude that.  Home detention --

8          MR. MARTINELLI:  No, but he's going to have to

9  give his work schedule, correct, to --

10         THE COURT:  Do you want to respond?

11         MR. RODDIN:  Yes, please.  A few points.

12         Initially, as to the point about there's no one

13  on earth who would call Mr. Brooke a Gambino associate,

14  it's not something that I just made up.  It's alleged in

15  the indictment at paragraph 15.

16         With respect to injuries to John Doe number 2,

17  I am quite honestly astounded to hear defense counsel say

18  that that is a not serious assault.

19         THE COURT:  Okay.  I see the picture.  One eye

20  is shut, the other is almost --

21         MR. MARTINELLI:  It's a black eye and cut,

22  Judge.

23         MR. RODDIN:  The argument that the Court should

24  look at that photo and say that it's no big deal, it's

25  just a bloody forehead is one that the Court can and

30

Proceedings

1   should easily reject.

2           And third, with regard to the dismissal of that

3   assault in state court, immediately after that assault

4   the victim, and John Doe number 2, contacted Danny

5   Tantillo, Mr. Brooke's co-defendant, because John Does 1

6   through 4 knew that Tantillo was the one behind the

7   assault.  It's part of the extortion scheme that he's

8   charged in.  Danny Tantillo pressured those people not to

9   pursue the charges.  And after speaking with Tantillo,

10  the victim contacted the NYPD and said in substance after

11  consulting with some mutual friends I've decided I don't

12  want to press charges.  So that's the reason for the

13  state dismissal of the case, witness intimidation,

14  witness tampering.  Not because there was some self-

15  defense claim that was corroborated and led to the

16  dismissal of the case.  It was misconduct that led to the

17  dismissal of the case, intimidation, and fear.

18          MR. MARTINELLI:  Your Honor, the government

19  claims to have spoken to -- or they claim to have put it

20  in their detention memo, but the detention memo was from

21  them.  So they've misled the Court.  They didn't tell the

22  Court about this dismissal.

23          And interestingly, their allegations claim that

24  Mr. Tantillo called him and I guess brokered a deal.  I

25  would disagree with that completely.  Mr. Brooke has

31

Proceedings

1  nothing to do with Mr. Tantillo.  Okay?  I don't think
2  the wiretaps would show that.  If they were, they would
3  be here today.  Mr. Brooke would be charged with the
4  racketeering conspiracy.  He's not.

5          And even more to the point, Judge, just like
6  they spoke to their witness, who by the way hired Mr.
7  Brooke twice afterwards, just like they spoke to their
8  witness, I spoke to the lawyer and the lawyer told me
9  this is an open and shut case of a 343 prior to
10 arraignment.

11          So the fact that they've misled you alone and
12 are now telling you that they knew about the dismissal is
13 a little bit concerning to me.  That should be in their
14 memo, Judge.

15          THE COURT:  All right.  Let's move on to -- I'm
16 saving my determinations for each of them for the end.
17 Mr. Vicari.

18          MR. GALEOTTI:  Thank you, your Honor.

19          Here again, the government seeks detention of
20 Mr. Vicari pursuant to 18 United States Code Section
21 3142(f)(1)(A) because the defendant engaged in a crime of
22 violence, as well as pursuant to 18 United States Code
23 Section 3142(f)(2) because there's a serious risk the
24 defendant will flee and because there is a serious risk
25 the defendant will obstruct justice or threaten to injure

32

Proceedings

1   witnesses or victims.

2           Your Honor, like Mr. Rappa, Mr. Vicari is a

3   longtime associate of the Sicilian mafia as well as the

4   Gambino crime family in New York.  Mr. Vicari was caught

5   on several wiretaps, judicially authorized wiretaps, of

6   Mr. Rappa's phone.  Mr. Rappa and Mr. Vicari discussed in

7   detail the extortion of John Doe 1.  They discussed in

8   detail in incident in which they approached an associate

9   of John Doe 1, threatened him.  They discussed in detail

10  picking up cash payments from extortion victims.  Indeed,

11  as indicated in the detention memorandum, Mr. Vicari,

12  after successfully extorting one victim, toasted

13  champagne which Mr. Rappa sent to Mr. Tantillo

14  demonstrating both their involvement in the underlying

15  violent extortion as well as their association with the

16  Gambino crime family.  They worked quite closely with Mr.

17  Tantillo.

18          I would also submit, your Honor, that pursuant

19  to the wiretaps, Mr. Vicari was treated as somewhat at a

20  lesser station within the hierarchy and he often felt he

21  had to prove himself to both Mr. Rappa and Mr. Tantillo,

22  was therefore willing to engage in or conduct in order to

23  demonstrate his worth to the organization, namely the

24  Gambino crime family.

25          With respect to flight, your Honor, Mr. Vicari

33

Proceedings

1   is a dual citizen.  He has an Italian passport.  He has

2   ties to Sicily and the Sicilian mafia.  He has financial

3   resources as well as contacts here and abroad who could

4   help him flee.  He's facing significant penalties.

5          And so for those reasons he's a risk of flight.

6   So we submit, your Honor, for both dangerousness and risk

7   of flight Mr. Vicari should be detained pending trial.

8          THE COURT:  Refresh my recollection.  You have

9   in the detention memo discussed the actual actions of Mr.

10  Vicari?

11         MR. GALEOTTI:  Yes, your Honor.  Those include

12  page 6.  And your Honor, if I may, the allegation is that

13  Mr. Vicari was part of the extortion of John Doe 1.  Mr.

14  Vicari, Mr. Tantillo, Mr. Rappa, Mr. Johnson, and others

15  coordinated damage to John Doe 1's carting trucks and the

16  hammer assault of the employee at demolition company 1.

17  Vicari and Rappa approach John Doe 1's associate and

18  threatened him and John Doe 1 if the associate did not

19  get John Doe 1 to make extortionate payments.

20         Rappa and Vicari called Tantillo immediately

21  afterwards to summarize the events and Rappa reported to

22  Tantillo that the associate almost started crying.

23         During another intercepted phone call, Rappa

24  told Tantillo that Vicari quote acted like the last of

25  the samurai during their meeting with the associate.

34

Proceedings

1  Rappa described how Vicari picked up a knife and directed

2  John Doe 1's associate to threaten to cut John Doe 1 in

3  half in order to get John Doe 1 to make extortionate

4  payments.  According to Rappa, what Vicari said was get t

5  his ax, you make him two.

6        Your Honor, this is illustrative of the kind of

7  conduct that Mr. Vicari himself engaged in.  This isn't

8  just an association issue.  It is certainly an

9  association issue, but it is beyond that.  It goes to his

10  own actions and his own involvement in threatening

11  individuals that the Gambino crime family was extorting.

12        THE COURT:  Do you have any similar evidence in

13  wiretaps or anything like that for Mr. Brooke?

14        MR. GALEOTTI:  Your Honor, that predates the

15  judicially authorized wiretaps in this case, that

16  assault.

17        THE COURT:  All right.  Thank you.  Mr.

18  Shulman?

19        MR. SCHULMAN:  Thank you, your Honor.  It's our

20  position that consistent with the recommendation of

21  Pretrial Services there is substantial evidence of a set

22  of conditions that can ensure Mr. Vicari's appearance to

23  defend against these charges as well as his safety in

24  the -- ensuring safety in the community generally.

25        Mr. Vicari is uniquely situated if you will,

35

Proceedings

1   your Honor.  He's a U.S. citizen as well as a citizen of
2   Italy.  As I've already discussed with the government,
3   he's already produced his U.S. passport to the government
4   and his wife, who's on the conference line, has his
5   Italian passport.  And we certainly agree to turn that
6   over to take away any risk of flight and leaving the
7   country or leaving the New York City area for that
8   matter.
9          Part of what makes this situation unique is
10  that Mr. Vicar is 62 years old.  He had serious, or he
11  has serious cardiac issues including heart surgery
12  earlier in the year that required three stents.  His
13  wife, who he's been married to for 40 years I believe
14  underwent cancer surgery last week and is recovering.
15  And Mr. Vicari is the sole caretaker for her as well as
16  her mother who also lives with them.
17         In the courtroom today, your Honor, is Antonino
18  Russo, who's in the front row on the right who's Mr.
19  Vicari's brother-in-law.  Mr. Vicari and Mr. Antonino,
20  Mr. Russo, together own a two-family house in Elmont.
21  Mr. Russo and his wife live on the ground floor.  Mr.
22  Vicari, his wife, and his mother live upstairs.  Mr.
23  Russo, as well as Mr. Vicari and his wife, have agreed to
24  post the house as bond to help ensure Mr. Vicari's
25  appearance to defend against these charges.

36

Proceedings

1          Also in court is Mr. Vicari's youngest son, he
2    has two sons, Lorenzo, who's sitting in the front row
3    second from the right who works for the New York City
4    Sanitation Department earning a respectable income which
5    I could share with the Court if you want to hear it, but
6    also Mr. Vicari, younger Mr. Vicari, is here to help give
7    assurances to the Court that his father will be defending
8    against these charges, takes the charges seriously, and
9    would be willing to again post whatever type of bond is
10   necessary that would give peace to the Court that again
11   Mr. Vicari wouldn't be a risk to the safety of the
12   community or flight.
13          Mr. Vicari works at Novo Construction as a
14   general superintendent in New Jersey.  He's been
15   gainfully employed for 40 years as I understand.  He
16   currently is working in construction.  Prior to that, he
17   worked in a different area for a different demolition
18   company I believe.
19          We would agree to terms of restricting his
20   travel to the New York City metro area including New York
21   City, Long Island.  And frankly the only additional
22   condition that we would propose for the Court is New
23   Jersey because that's where Novo Construction is located
24   and that's where he reports to work each day.
25          We would highlight for the Court that the

37

                              Proceedings

1   allegations of Mr. Vicari are related to threats against

2   only one person again identified as John Doe 1 throughout

3   the sentencing, the detention memorandum.  There are no

4   other allegations against Mr. Vicari beyond this one

5   situation where John Doe 1 was supposedly threatened.  Of

6   course Mr. Vicari denies those allegations and he has a

7   very different position about what the image on page 6 of

8   him holding a glass of wine was meant to represent.

9          Mr. Vicari has no criminal history neither in

10  Italy or the United States.  There is no indication that

11  Mr. Vicari was ever engaged in any acts of witness

12  retaliation, witness intimidation, obstructing justice.

13  No evidence of substance abuse, no access to weapons, no

14  indication of an access to weapons again, giving the

15  Court assurances that he will not be a threat to the

16  community.

17         I won't dwell on it, but as the Court heard

18  earlier there were search warrants executed on an earlier

19  date but Mr. Vicari complied with it.  The officers

20  entered his home and took certain property from him and

21  he just kept going about his business.  He kept showing

22  up to work each day, kept taking care of his wife, kept

23  taking care of his mother-in-law.

24         Just checking my notes, your Honor.  I think

25  I'm just about done.  That's all I have.

Proceedings

1       And your Honor, again, Mr. Vicari's wife,

2 Josephine, is on the line.  So to the extent that the

3 Court wants to inquire of her, please do so, and the

4 brother-in-law and son are in the courtroom right now.

5       THE COURT:  Have you had the opportunity to

6 speak with any of the proposed sureties?

7       MR. GALEOTTI:  We haven't, your Honor.

8       THE COURT:  You haven't.

9       MR. GALEOTTI:  Have not.

10       MR. SCHULMAN:  Your Honor, if I may, I did

11 propose this package to the government early in the

12 morning with the names and I've been trying to get

13 consent and work this out with them.

14       THE COURT:  Okay.  You want to respond?

15       MR. GALEOTTI:  Your Honor, I would just correct

16 one thing.  I don't think there's any additional points

17 to be made.  But again, just to emphasize, even within

18 the extortion of John Doe 1, multiple individuals were

19 threatened just in that scheme alone.  John Doe 1 himself

20 Mr. Vicari engaged in, as well as associates of John Doe

21 1 which again, Mr. Vicari also engaged in.

22       So these violent threats were a pattern of

23 behavior consistent with the enterprise and consistent

24 with Mr. Vicari's own personal conduct.  It was not a one

25 off or an aberration.

39

Proceedings

1        THE COURT:  Okay.  Let's move on to Mr.
2   Minsquero.
3        MR. RODDIN:  Your Honor, with respect to Mr.
4   Minsquero, the government is also moving for detention on
5   the same two grounds under Section 3142(f)(1)(A) because
6   the defendant is charged with a crime of violence, and
7   under 3142(f)(2)(A) and that there is a serious risk he
8   will flee, as well as (f)(2)(B) --
9        THE COURT:  Just one second.
10       MR. RODDIN:  -- there's a serious risk he will
11  obstruct justice --
12       THE COURT:  Just one second, please.
13       MR. RODDIN:  -- or threaten or injure witnesses
14  or victims in this case.
15       THE COURT:  I apologize.
16       MR. RODDIN:  That risk of witness intimidation
17  is not merely based on the defendant's association with
18  the Gambino family which is a substantial reason in
19  itself.  He's also charged with witness retaliation.
20  This is the assault at the restaurant that's described on
21  page 9 of our detention memorandum in which he and co-
22  defendant James LaForte caused an injury to another
23  person when LaForte smashed that person with a glass
24  bottle and this defendant flipped the table over sending
25  drinks and shattered glass all over the place.

40

Proceedings

1        The detention memo also describes an additional

2    violent incident, this one rather more recent in

3    September of 2023 at a restaurant in New Jersey where a

4    short time after Minsquero and Joseph Lanni were asked to

5    leave because they had become belligerent and a short

6    time after Lanni called the restaurant dozens of times

7    and threatened the restaurant's owner, two men assaulted

8    the restaurant's owner and the owner's spouse at

9    knifepoint.

10        There is also evidence that Joseph Lanni, who

11    as we discussed a few times this afternoon, is --

12        THE COURT:  Is it the government's contention

13    that one of those two men were Mr. Minsquero?

14        MR. RODDIN:  Your Honor, Mr. Minsquero was

15    present with Mr. Lanni earlier in the evening during the

16    initial altercation when the two were asked to leave.

17    There's video surveillance that we identify in the

18    detention memo where Mr. Lanni is attempting to in

19    essence follow through on his threat to burn down the

20    restaurant.  And the evidence suggests that they were

21    together for a considerable period of time that evening.

22        There's also evidence that Lanni, who was a

23    captain in the Gambino crime family, is involved with

24    putting up certain real property as proposed as part of

25    Mr. Minsquero's bond.  So there's not only the concern

41

Proceedings

1   about danger to the community under any conditions of
2   release, but certainly any bond under that type of
3   condition with that type of property being put up is not
4   going to guarantee anything.
5          So it's the government's position that for
6   those reasons Mr. Minsquero should be detained.
7          MR. GELORMINO:  Your Honor, may I be heard?
8          THE COURT:  Of course.
9          MR. GELORMINO:  At the podium?  Thank you.  I'm
10  happy to (inaudible).  I have a --
11         THE COURT:  You don't have a sinus infection?
12         MR. GELORMINO:  Yeah.  I am coughing a little.
13         Your Honor, I sat there and I'm appalled that
14  the government just said the last thing that they said
15  about Mr. Lanni putting up property or alleging something
16  like that for Mr. Minsquero.  They had asked me just
17  before court started about what they just spoke about and
18  I gave them the explanation as to what happened.  And I
19  am an officer of the court.
20         They claim -- what happened was there was a
21  bunch of emails that were going back and forth, dozens in
22  a list.  And in between that time, Ms. Lanni, who is
23  friends with Mr. and Mrs. Minsquero, who had never been
24  through this before, sent me an email with the two
25  properties that Mr. Minsquero would post in case he had

42

Proceedings

1  to post bail.  I was forwarding those two properties to

2  my assistant but I forwarded it to one of the government

3  attorneys instead unbeknownst to me.  They asked me as

4  soon as I walked in.  I walked over and I explained the

5  situation.  For them to use that in this situation just

6  goes to show your Honor what's going on here as far as to

7  Mr. Minsquero.  That was just an honest mistake.

8           THE COURT:  Who owns those properties?

9           MR. GELORMINO:  Mr. and Mrs. Minsquero,

10  Vinnie's parents.  They've owned it for 30 years.  Mr.

11  Minsquero is a former, retired firefighter, mechanic in

12  the fire department for 30 years.  Mrs. Minsquero worked

13  as a school aide.  They've owned the property since 2010

14  I think or 2008.  They --

15           THE COURT:  There are two properties though you

16  said.

17           MR. GELORMINO:  Second property is his sister's

18  property who's married with her husband.

19           All I did in an email chain that was this long

20  was forward it to the wrong spot.  And to use that here

21  to try to keep Mr. Minsquero in jail is really, really

22  disconcerting, Judge, to me and to the Court.

23           As far as the allegations go, your Honor, Mr.

24  Minsquero stands before you.  He's worked at the same

25  place for ten years.  He's an MTA employee.  The only

43

Proceedings

1  family he belongs to is the Minsquero family.  He's

2  worked at MTA for ten years.  Before that, he worked at

3  the Port Authority for another five years.  He's been a

4  hard-working young man his whole entire life.  He's never

5  traveled out of the country other than to go on a couple

6  of vacations.  He's a single guy.  When he was younger,

7  go to Club Med.

8           And what the people allege in their detention

9  memo --

10          THE COURT:  I'm listening.

11          MR. GELORMINO:  -- is tantamount to just

12  flipping a table.  He was never, Mr. Minsquero, was never

13  served a warrant three years ago.  He had no idea this

14  was coming down supposedly.  If he was such a risk to the

15  community, I don't want to belabor the point because your

16  Honor has mentioned a couple of cases, they could have

17  arrested him for the last three years.  I actually called

18  the people a month ago, or the government a month ago, to

19  see what was going on and to surrender himself.

20          But again, he was never notified.  There was

21  nothing overt towards him.  He didn't know this was going

22  on until about a month ago, maybe two months ago when the

23  FBI agent stopped him.

24          As far as what they allege in their papers, he

25  flipped a table.  And we are not conceding that he did

44

Proceedings

1  that, but that's what it amounts to.  And they want him

2  to spend the next year in jail while he fights this case

3  in jail because he allegedly flipped a table?  He's not

4  the one -- the government themselves say right in their

5  papers he's not the one that hit that person.  He was at

6  a restaurant.  There's no other crimes alleged here, your

7  Honor.  None.

8          The people refer to some crime in Jersey.  And

9  if you notice, your Honor, I know how intelligent your

10 Honor is and you don't miss a thing, they didn't answer

11 your question when you asked your question whether it was

12 him or not.  He gave a long-winded answer but he never

13 answered your question.  He was never picked out.  From

14 what I understand, the people in that, the victim in that

15 case was shown a picture of Mr. Minsquero and didn't pick

16 him out.

17         And then they refer to a situation where Mr.

18 Lanni went to a gas station or something like that.  In

19 their own papers they say that Mr. Minsquero diffused

20 that situation, calmed that situation down.  I've known

21 Vincent for six or seven years now.  He's never had a

22 temper.  He speaks quietly.  He's soft-spoken.  He's a

23 good guy.

24         And for them to want to keep him in jail for a

25 year while this case is going on over an incident about

45

Proceedings

1   flipping a table that again we do not concede at all is

2   absurd.

3           Your Honor, he's got no history of travel.  He

4   doesn't have a passport.  He's not a flight risk.  He's

5   got an autoimmune disease which he's been diagnosed with.

6   Again, there's no subpoena that's been served.  And the

7   Pretrial report themselves recommends an unsecured bond

8   and a bunch of restrictions that Mr. Minsquero would

9   obviously follow.

10          So your Honor, I'm going to ask you to give a

11  lot of credence to what the Pretrial report says and

12  allow Mr. Minsquero to have his family post his home.

13  The home is worth almost $1 million, $950,000.  I think

14  there's a $200,000 bond on it.

15          THE COURT:  Mortgage.

16          MR. GELORMINO:  Mortgage still on the house.

17  Yes.

18          THE COURT:  What about the sister's property?

19          MR. GELORMINO:  The sister's property is worth

20  I think 650 or 7, and there's a $500,000 mortgage.  She's

21  a lot younger, your Honor, so she didn't get a chance to

22  pay off her mortgage yet.  As far as the parents go,

23  they've been paying off their mortgage for quite some

24  time.  And again, your Honor --

25          THE COURT:  And the sister owns property with a

46

Proceedings

1   husband or just herself?

2           MR. GELORMINO:  It's with her husband.

3           THE COURT:  Okay.

4           MR. GELORMINO:  Yeah.  The parents are in the

5   audience here.  They will be more than happy to sign,

6   your Honor.  Again, to put that mistake in my part in

7   this proceeding is just very disconcerting.  Thank you,

8   your Honor.

9           MR. RODDIN:  Your Honor, with respect to the

10  incident in Toms River, New Jersey, the simple answer is

11  that we're still investigating who the two perpetrators

12  of that assault was.  Were.  Excuse me.  Obviously, the

13  fact that Lanni and Minsquero were together for a

14  considerable part of the evening and that as far as we

15  know there was nobody else who had a similar vendetta

16  against this restaurant, those factors are certainly

17  suggestive of their involvement in the assault.  But this

18  was about two months ago and we're continuing to

19  investigate that.

20          It's also important for the Court to know that

21  in that incident there is a similar pattern of behavior

22  on the part of the victims as there was in the assault

23  involving Robert Brooke.  One of the victims of that

24  assault contacted someone he knew who he knew might have

25  information about organized crime and said, as we allege

47

Proceedings

1  on page 10 of the detention memo, "This person Joe, Joe

2  Lanni, identified himself as a Gambino.  Can you find out

3  for me if he really is?"  The answer came back to the

4  victim from the friend, "Yes, Joe Lanni really was a

5  Gambino."  And subsequent to that, the restaurant owner

6  and the spouse contacted the Toms River Police Department

7  and said we don't want to pursue this any further because

8  they learned he was a member of an organized crime

9  family.

10         With respect to the interactions at the gas

11  station, to the extent that Mr. Minsquero was diffusing

12  the situation, I think it's fair to infer that he wasn't

13  doing it out of the goodness of his heart.  I know I've

14  said it several times, but Joseph Lanni is a captain.

15  It's not a good look for a captain in an organized crime

16  family to try to burn a restaurant, and arson attracts

17  attention.  And so to the degree that Mr. Minsquero was

18  instructing or trying to persuade Mr. Lanni not to follow

19  through with that, he was doing so to protect the

20  captain, to protect the enterprise.

21         And finally, on the point about the involvement

22  of Mr. Lanni or his family in posting Mr. Minsquero's

23  property, defense counsel pointed out that it was a

24  relative of Joseph Lanni who provided the information to

25  him about Mr. Minsquero's properties.  I think the Court

48

Proceedings

1   should really take a hard look at why it might be that a

2   relative of Joseph Lanni is the one providing detailed

3   information about Vincent Minsquero's real property.

4   It's not for any good reason.

5          MR. GELORMINO:  Your Honor, that is completely

6   untrue.  Ms. Lanni -- and again, that is disingenuous and

7   untrue.  That should be something the Court considers.

8   Mr. and Mrs. Minsquero have never dealt with a situation

9   like this.  Unfortunately, Ms. Lanni has.  They've been

10  friends for a long time.  She asked for help.  They

11  called me a bunch of times both of them on the phone

12  together.  So to misinterpret that and for the Court to

13  use that is totally misguided, your Honor.

14         As far as the case down in Jersey, from what I

15  understand the two people were in the restaurant, the

16  owners of the restaurant, before they found out that Mr.

17  Lanni was so-called a Gambino captain, refused to pick

18  Mr. Minsquero out.  It wasn't after, it was before.

19         And the last point I'd like to make, your

20  Honor, is he's never been arrested before.  He's never

21  been charged with a crime.  He's 36 years old.  His

22  record is completely, completely clean.  And for the

23  government to allege that there was an incident down in

24  Manasquan and Mr. Minsquero was doing it for untoward

25  reasons other than the fact that he didn't want to see

Transcriptions Plus II, Inc.

49

Proceedings

1   any kind of escalation of a situation is again just

2   disingenuous.  Your Honor, I would ask you not to

3   consider any of those things.

4                    (Pause in proceedings)

5            THE COURT:  Close call for all of these

6   gentlemen.  Notwithstanding the government's proffer that

7   each of these gentlemen is a danger and a risk of flight,

8   I find that there are conditions that will guard against

9   the danger and the risk of flight along the lines of what

10  has been proposed.  I'm inclined to release each of them

11  on a $1 million bond with the sureties they propose, the

12  properties, and the other suggestions, conditions

13  suggested by Pretrial Services for each of them including

14  home detention and location monitoring as directed by

15  Pretrial Services.

16            I am willing to stay those decisions if the

17  government is going to appeal to Judge Block or to the

18  miscellaneous judge but I need to know that now because

19  we have the sureties here and I don't want to waste

20  everyone's time.

21            MR. GALEOTTI:  Your Honor, the government would

22  ask for a short stay till tomorrow afternoon by which

23  point the government will either make its appeal or

24  notify the Court that it won't make such an appeal to the

25  extent that's determined earlier than that time that the

50

Proceedings

1   government would of course let the Court know.  But at

2   this point we do intend to file an appeal and therefore

3   ask for a stay for 24 hours.

4          THE COURT:  Do you know -- well, never mind.

5   That's fine.  Who knows what tomorrow brings.  We might

6   have another busy day.

7          But I will give all of the sureties an

8   opportunity to appear by telephone rather than in person

9   tomorrow.  And the way we could do it is we can take

10  everyone's signature now but we'll --

11         MR. MARTINELLI:  Your Honor, if Ms. Puza could

12  put her signature on now?  I think she's scheduled to

13  visit her family at some point on Monday.

14         THE COURT:  All right.  Let's do this.  Since

15  we have everyone here, let's do it.  I will not sign the

16  bonds until we know whether or not the government is

17  appealing.  So let's start with Mr. Rappa.  Who are the

18  proposed sureties, the names, please?

19         MR. GOSNELL:  Obviously one would be Mr. Rappa

20  and the second would be his wife, Margarita Rappa, who is

21  in the second row.

22         MR. RODDIN:  Your Honor, if we may, just to

23  confirm on what the conditions include before the bonds

24  are signed, is there a provision in the proposed bond

25  that your Honor intends to order that there should be no

51

Proceedings

1  contact with any co-defendants or members of --

2          THE COURT:  Well, it's a standard condition in

3  these types of cases.  No contact with co-defendants,

4  witnesses, or known or suspected members of organized

5  crime.

6          MR. RODDIN:  Thank you, your Honor.

7          THE COURT:  So for Mr. Rappa, it will be a

8  secured bond secured by his home and his wife acting as a

9  surety; Pretrial Services supervision; surrender of

10  passports and no applications for passports or

11  international travel documents; travel restricted to New

12  Jersey, New York City, and Long Island; no contact with

13  co-defendants, witnesses, or victims, and known or

14  suspected members of organized crime; Pretrial Services

15  supervision; random home visits; reporting as directed;

16  maintain a residence as approved by Pretrial Services;

17  and home detention with electronic monitoring.  Mr. Rappa

18  can leave for court appearances, court-ordered

19  obligations, attorneys visits, religious services,

20  medical appointments, employment, et cetera.

21          Ms. Rappa, can you please come up?  Ms. Rappa,

22  I'm going to ask you some questions.

23          MS. RAPPA:  Good evening, your Honor.

24          THE COURT:  Your answers must be made under

25  oath, so please raise your right hand.

52

Proceedings

1  M A R G A R I T A   R A P P A,

2      called as a witness, having been first duly sworn,

3      was examined and testified as follows:

4              THE COURT:  Okay.  What is the address of the

5  houses that --

6              MS. RAPPA:  2 Matthew Manor is Brunswick, New

7  Jersey.

8              THE COURT:  2 Matthew Manor?

9              MS. RAPPA:  Yeah.

10             THE COURT:  Okay.  All right.  And are you

11 working?

12             MS. RAPPA:  Yes.

13             THE COURT:  What do you do for a living?

14             MS. RAPPA:  I do work in a high school.  I'm a

15 paraprofessional.

16             THE COURT:  Okay.  And what is your income

17 approximately per year?

18             MS. RAPPA:  From school?

19             THE COURT:  Yes.

20             MS. RAPPA:  Because I do work at the pizzeria

21 too.  We have restaurants, your Honor.

22             THE COURT:  You have a restaurant?

23             MS. RAPPA:  Yes, we do have, which my husband

24 is taking care of 14 hours a day.

25             THE COURT:  How much is the house worth?

Transcriptions Plus II, Inc.

53

Proceedings

1      MS. RAPPA:  We actually was about to selling,
2  we just didn't find anywhere to go, about a year ago.
3  And were willing to pay 1.6.
4      THE COURT:  Okay.  You understand what it means
5  to sign a bond?
6      MS. RAPPA:  Yes, I do.
7      THE COURT:  And you are willing to post your
8  house as collateral, correct?
9      MS. RAPPA:  Correct.
10      THE COURT:  All right.  Why don't we give --
11  and the confession of judgment has to be filed by
12  Wednesday.
13      MR. GOSNELL:  I was going to request that, your
14  Honor.
15      THE COURT:  Okay.
16      MR. GOSNELL:  So long as she's given some time,
17  as long as he is released upon his signature and upon his
18  wife's signature once the determination by the U.S.
19  Attorney's Office as to whether they will appeal has been
20  decided.
21      One additional request that I have, and this
22  goes to notice, which is I know that the standard
23  condition is that Mr. Rappa not have any contact with
24  victims or witnesses.  Because of the fact that we don't
25  know who those are, I mean that solely is within the

54

Proceedings

1  province of the government as to who they consider is a

2  victim or a witness in the matter, I would ask that the

3  Court direct them to provide us with a list of those

4  individuals so that we can ensure Mr. Rappa doesn't have

5  any contact with them because otherwise he's in sort of a

6  no win situation.  If he has contact, if they deem that

7  person as a witness, he is in violation of the

8  conditions, the house is subject to seizure, the bond is

9  subject to seizure as well.  And that could have

10 obviously significant consequences on himself, his wife,

11 and everybody in his family.

12        MR. GALEOTTI:  Your Honor, it's not a

13 reasonable request for the government to provide a list

14 of witnesses who have been targeted, attached, threatened

15 to the defendants in this case.  I think the best thing

16 to do is the defendants understand who the witnesses are.

17 If there's a disagreement, we would certainly engage with

18 counsel prior to making an application to the Court.  But

19 we could not possibly in any reasonable way to protect

20 safety provide a list of witnesses in this case.  It

21 would endanger their safety and that's a risk we can't

22 bear.

23        MR. GOSNELL:  And your Honor, by the same

24 token, Mr. Rappa couldn't possibly determine who he can

25 or can't have conversations with.  This isn't that he's

55

Proceedings

1  not allowed to threaten people or he's not allowed to

2  have any sort of criminal activity with people.  It's

3  merely having contact with any individual at all.

4          So for example, if one of the witnesses works

5  at one of the restaurants that he owns and operates and

6  he goes to work, he is immediately in violation of the

7  bond.

8          THE COURT:  Do any of the victims work at

9  restaurants that Mr. Rappa owns and operates that you

10 know of?

11         MR. GALEOTTI:  No.

12         THE COURT:  Okay.  And Mr. Brooke, who are the

13 sureties, please?

14         MR. MARTINELLI:  It would be Mr. Brooke

15 himself, his fiancée who's here --

16         THE COURT:  Farjana Puza?

17         MR. MARTINELLI:  Yes.  She would not be on the

18 property, she would just sign the bond.  The property is

19 her mother --

20         THE COURT:  But they need to sign the bond as

21 well.

22         MR. MARTINELLI:  Yes.

23         THE COURT:  What's the name?

24         MR. MARTINELLI:  Salma Parvin, P-A-R-V-I-N.

25         THE COURT:  Is she here?  Or no, she's not?

56

Proceedings

1          MR. MARTINELLI:  She's not.

2          THE COURT:  And her father?

3          MR. MARTINELLI:  I believe the second person on

4    the deed is the sister.  It's Pfarzana, P-F-A-R-Z-A-N-A,

5    Pushpo, P-U-S-H-P-O.

6          THE COURT:  Okay.  We're going to have to get

7    all of their addresses to put on the bond.  I'm sorry,

8    Ms. Rappa, you can sit down.

9          MS. RAPPA:  Oh, okay.

10          THE COURT:  I apologize.

11          MR. MARTINELLI:  Your Honor, I can give you the

12    address of the property that would be posted.

13          THE COURT:  Yes, please.

14          MR. MARTINELLI:  33 Forrestal,

15    F-O-R-R-E-S-T-A-L, Avenue, Staten Island, New York 10312.

16          THE COURT:  And that's owned by Pfarzana --

17          MR. MARTINELLI:  And Salma.

18          THE COURT:  -- Pushpo and Salma Parvin.

19          MR. MARTINELLI:  That's correct.

20          THE COURT:  Okay.  They are going to -- two

21    things for them.  We have Ms. Puza here and she's going

22    to come up and stand by the podium so I can give her the

23    warnings.  Ms. Parvin and Ms. Pushpo will have to call in

24    tomorrow afternoon if the government doesn't appeal or if

25    they do appeal and it's unsuccessful, for me to give them

57

Proceedings

1    warnings and take their signatures over the phone.  And

2    we can do that -- well, I don't know when they'll be able

3    to appeal.

4              THE CLERK:  So can the government contact our

5    office?

6              MR. GALEOTTI:  We will.  We'll let --

7              THE COURT:  Let's schedule it for 2 o'clock.

8              THE CLERK:  Okay.  Let's do that.

9              MR. GALEOTTI:  That's fine, your Honor.  We

10   certainly can let --

11             THE COURT:  We'll know by then.

12             MR. GALEOTTI:  Yes.  Exactly.

13             THE CLERK:  Okay.

14             THE COURT:  And the confession of judgment

15   needs to be filed by Wednesday the --

16             THE CLERK:  We said by next Wednesday?

17             THE COURT:  Wednesday is the 15th.

18             THE CLERK:  It's the 15th.

19             MR. MARTINELLI:  That's correct, your Honor.

20             THE COURT:  Yes, by Wednesday 15th.  And it's

21   the same conditions, basically the same conditions for

22   Mr. Brooke.  The amount of the bond is $1 million secured

23   by the property; Pretrial Services supervision; random

24   home and workplace visits; surrendering passports, no

25   applications for any other passports or international

58

Proceedings

1  travel documents; travel restricted to New York City,

2  Long Island, and the Southern District of New York; no

3  contact with co-defendants except in the presence of

4  counsel; no contact with victims or witnesses; and home

5  detention with location monitoring as directed by

6  Pretrial Services.

7         MR. MARTINELLI:  Your Honor, may I add the

8  District of New Jersey?  Mr. Brooke's company does a lot

9  of repairs to their machinery in New Jersey which he's

10  responsible for delivering.

11         THE COURT:  I'm going to put and the District

12  of New Jersey only for work.  All right.

13         Ms. Puza, you heard our discussion?

14         MS. PUZA:  Yes.

15         THE COURT:  Please raise your right hand.

16  F A R J A N A   P U Z A,

17     called as a witness, having been first duly sworn,

18     was examined and testified as follows:

19         THE COURT:  Okay.  You heard our discussion?

20         MS. PUZA:  Yes.

21         THE COURT:  You understood it?

22         MS. PUZA:  Yes.

23         THE COURT:  Do you understand what it means to

24  sign a bond?

25         MS. PUZA:  Yes.

59

Proceedings

1        THE COURT:  So if Mr. Brooke is released and he
2   violates the terms of his release, you're going to owe
3   the government 1 million bucks.  It's a lot of money.
4   Right?  They can garnish your wages, seize your assets to
5   satisfy that in addition to going after your mother and
6   sister's house.
7        MS. PUZA:  Okay.
8        THE COURT:  All right?
9        MS. PUZA:  Yes.
10       THE COURT:  Okay.  Thank you.  Well actually
11   no, I'm sorry, you're going to have to sign this bond.
12       THE CLERK:  Can you come here?
13       THE COURT:  Yes, have her come up.
14                (Pause in proceedings)
15       THE COURT:  You can hold onto this, Michelle,
16   because I'm not going to sign it until tomorrow.  And
17   actually you know what?  We'll take the defendants'
18   signatures now.
19       MR. GOSNELL:  Thank you, your Honor.  I was
20   going to suggest that as well.
21       THE COURT:  Yes.  They'll be brought back
22   tomorrow.  And if there's no appeal or if it's an
23   unsuccessful appeal, all I'll need to do is sign and get
24   the sureties and then they can be released from
25   downstairs to go to Pretrial.

60

Proceedings

1          MR. RODDIN:  Right.  And for those who have

2   already signed, whose suretors have already signed,

3   they'll just be released immediately to go to Pretrial.

4          THE COURT:  Yes.

5          MR. RODDIN:  Okay.

6          THE COURT:  If they sign before, yes.  And for

7   Mr. Vicari, who's here for Mr. Vicari?  It's his brother-

8   in-law Antonino?

9          MR. SCHULMAN:  That's right, Antonino Russo and

10  his son Lorenzo.

11          THE COURT:  Lorenzo.

12          MR. SCHULMAN:  Yes, your Honor.  And his wife

13  is on the line.

14          MS. VICARI:  Yes, I'm here.  Okay.

15          THE COURT:  Okay.  Can you gentlemen come up to

16  the podium, please?

17          MR. SCHULMAN:  Your Honor, if I could just add

18  one point to have clarification?  The house that they

19  reside in is also, is owned by Mr. Vicari, his wife, Mr.

20  Russo, and Mr. Russo's wife is also on that deed, so the

21  four of them.

22          THE COURT:  Okay.  She's going to have to sign

23  the bond then.

24          MR. SCHULMAN:  I understand that and Mr. Russo

25  understands that and I've gotten assurances that that's

61

Proceedings

1  fine, that that will be okay.

2          THE COURT:  Okay.  And we can do that on the

3  phone tomorrow.

4          MR. SCHULMAN:  Okay.  Thank you.

5          THE COURT:  All right.  Please raise your right

6  hand.

7  A N T O N I O   R U S S O  and  L O R E N Z O

8  V I C A R I,

9      called as witnesses, having been first duly sworn,

10      were examined and testified as follows:

11          THE COURT:  Okay.  And Ms. Vicari, you're on

12  the phone.

13  J O S E P H I N E   V I C A R I,

14      called as a witness, having been first duly sworn,

15      was examined and testified as follows:

16          THE COURT:  Okay.  I hope you folks were

17  listening to the discussions throughout the proceedings

18  and understand what I was saying.  Yes?

19          MR. VICARI:  Yes.

20          MR. RUSSO:  Yes, sir.

21          THE COURT:  Okay.

22          MS. VICARI:  Yes.

23          THE COURT:  You understand that by signing this

24  bond you are obligating yourselves each individually and

25  collectively to pay to the government $1 million should

62

Proceedings

1   Mr. Vicari violate the terms of his release.  Yes?

2         MR. RUSSO:  I do.

3         MR. VICARI:  Yes, sir.

4         MS. VICARI:  Yes.

5         THE COURT:  Okay.  And the house, Mr. Russo, is

6   a two-family house.  You and your wife and Mr. Vicari and

7   his wife own it together?

8         MR. RUSSO:  Yes.  They live on the first floor.

9   I live on the second floor.  It was the opposite of what

10  the attorney said.  Yes, we own it together.  We own 50

11  percent each.

12        MR. SCHULMAN:  I apologize for that, your

13  Honor.  I conflated that.

14        THE COURT:  You probably own it joint tenants

15  or tenants in the entirety, so you each own the whole

16  thing.  I think that's the way it goes.  But it's been 35

17  years since I took property law.

18        MR. RUSSO:  The deed says 25 percent each.

19  That's what it says.

20        THE COURT:  Oh, it does?

21        MR. RUSSO:  Yes, it does.

22        THE COURT:  Okay.  All right.  So you know if

23  he violates the terms of his release, there goes the

24  house.  What's the equity in it about?

25        MR. RUSSO:  It's probably worth about 900,000,

63

Proceedings

1   a million.

2           THE COURT:  Okay.  All right.  So that's a big

3   incentive, Mr. Vicari, to do the right thing.  Do you

4   understand?

5           DEFENDANT VICARI:  Yes, yes.

6           THE COURT:  Okay.  All right.  And Lorenzo, you

7   work for --

8           MR. VICARI:  Department of Sanitation.

9           THE COURT:  Sanitation.  How long have you

10  worked there?

11          MR. VICARI:  Almost two years.

12          THE COURT:  All right.  How much do you make?

13          MR. VICARI:  About 80 grand a year.

14          THE COURT:  All right.  So if there's not

15  enough equity in the house, your dad violates the terms

16  of his release, they're going to garnish your wages, take

17  a little bit out of each paycheck.

18          MR. VICARI:  Yes, sir.

19          THE COURT:  So you've got to make sure he

20  behaves.  Understood?

21          MR. VICARI:  Yes, sir.

22          THE COURT:  All right.  Let me just take a look

23  at the bond and then -- do we have the address?  Okay,

24  what's the address?  Is it -- hold on just a second.

25          THE CLERK:  I thought I had it.

64

Proceedings

1          THE COURT:  40 Lucille?

2          THE CLERK:  Let me see.  Yeah, 40 Lucille

3   Avenue.  Is that correct?

4          MR. SCHULMAN:  Yes, that's right.  It's on the

5   cover of the Pretrial report.  That's where I just --

6          THE COURT:  That's where I'm getting it from.

7   Thank you.  Property owned by Josephine --

8          THE CLERK:  Antonio, right?  Antonio?  Okay.

9   And --

10          THE COURT:  Wait.  We need another -- so we

11   have Josephone Vicari, Lorenzo Vicari.  You have

12   Josephine twice.

13          MR. SCHULMAN:  Lorenzo Vicari is not on the

14   house.

15          THE COURT:  Hm?

16          MR. RUSSO:  Lorenzo Vicari is not on the house.

17          THE COURT:  No, no, no, but he's signing the

18   bond.

19          MR. RUSSO:  Oh, okay.

20          THE COURT:  That's okay.  So it's Antonino,

21   A-N-T-O-N-I-N-O, Russo.

22          THE CLERK:  Yeah.

23          THE COURT:  And Mr. Russo, what is your wife's

24   name?

25          MR. RUSSO:  Josephine also.

Transcriptions Plus II, Inc.

65

Proceedings

1      THE COURT:  Okay.  That's easy.  Josephine
2  Russo.  All right.  Ms. Vicari, you --
3      MS. VICARI:  Yes, I'm here.
4      THE COURT:  Ordinarily you'd be in court to
5  sign the bond.
6      MS. VICARI:  Unfortunately, I can't.
7      THE COURT:  But will you give me the authority
8  to sign the bond for you?
9      MS. VICARI:  Yes, I do.
10      THE COURT:  Okay.  And that's 11/8/2023.  Okay.
11  Now let's have, you know, let's have Mr. Vicari, Mr.
12  Russo, and Mr. Vicari sign.
13      THE CLERK:  Okay.  So sign your name.
14      MR. RUSSO:  My wife has to come here tomorrow
15  or we're going to do it over the phone?  My wife.
16      MR. SCHULMAN:  Over the phone.
17      THE CLERK:  I think it's over the phone.
18      MR. RUSSO:  Okay.  What time is the call going
19  to be?
20      THE CLERK:  2 o'clock.  Sign over there.  Oh, I
21  need your address too.
22              (Pause in proceedings)
23      THE CLERK:  And the property is owned by
24  Josephine?
25      MR. RUSSO:  Josephine, Josephine --

66

                          Proceedings

1              THE CLERK:  Josephine and Josephine.

2              MR. RUSSO:  Antonino.

3              THE CLERK:  Josephine.  Her name is Vicari?

4              MR. RUSSO:  One's Vicari and one's Russo.

5              THE CLERK:  Russo.  And --

6              MR. RUSSO:  Antonino Russo.  Can you give me a

7    number of who to call at that time?

8              THE CLERK:  The attorney is going to let you

9    know, yeah.  Okay.  So that's the home.  It's stayed

10   until tomorrow.  So we have to come back tomorrow.

11             MR. SCHULMAN:  Your Honor, can I just confirm

12   that -- sorry.  Just to confirm that Mr. Vicari's

13   permitted to go to Jersey for at least the work purposes

14   because that's where his principle place of business is.

15             THE COURT:  Is that not on the bond?  Did I --

16             MR. SCHULMAN:  I didn't see that, Judge, so --

17   can I approach, Judge?

18             THE COURT:  Yes.  Mr. Vicari needs to sign.

19   Did he?

20                   (Pause in proceedings)

21             THE COURT:  And that would be for Mr.

22   Minsquero.

23             THE CLERK:  Thank you.

24             MR. SCHULMAN:  It's on there, your Honor, so I

25   take that back.  Thank you.

67

Proceedings

1          THE CLERK:  Okay.  Thanks.

2          THE COURT:  The property that's being proffered

3    or put up for Mr. Minsquero is his mother and father's

4    home?

5          MR. GELORMINO:  Yes.

6          THE COURT:  And they're here?

7          MR. GELORMINO:  Yes.

8          THE COURT:  Okay.  And his sister's property?

9          MR. GELORMINO:  Judge, I just was spoken to by

10   Mr. Joseph Spano, who is Mr. Minsquero's first cousin and

11   who's been here the whole proceeding.  He's willing to

12   put up the second house to make it easier since he's

13   here.

14         THE COURT:  Okay.

15         MR. GELORMINO:  And his house can cover

16   everything.  He's got a $1.2 million house.  There's a

17   $200,000 mortgage.  He was in the navy and he retired

18   from the NYPD also as a mechanic.

19         THE COURT:  What's his name?

20         MR. GELORMINO:  Joseph Spano.

21         THE COURT:  You did tell me that.  I apologize.

22   And you have the address on that?

23         MR. GELORMINO:  I do.  It's 1 -- is it 10?

24         MR. SPANO:  100.

25         MR. GELORMINO:  100.  I'm sorry.  100.  I can't

68

Proceedings

1   understand my own handwriting.  Evergreen Avenue in
2   Staten Island, and that's 10305, your Honor.
3           THE COURT:  And what's mom and dad's property?
4           MR. GELORMINO:  It's on the Pretrial, it's 168
5   Stroud Avenue.
6           THE COURT:  Got you, got you.  Can we have --
7   and Mr. Minsquero's parents' first names are?
8           MS. MINSQUERO:  Barbara --
9           MR. GELORMINO:  Barbara and Vincent also.
10          MS. MINSQUERO:  -- and Vincent.
11          THE COURT:  Okay.  Can you guys come up,
12  please?  All please raise your right hand.
13  B A R B A R A  and  V I N C E N T   M I N S Q U E R O
14  and  J O S E P H   S P A N O,
15      called as a witnesses, having been first duly sworn,
16      were examined and testified as follows:
17          THE COURT:  Okay.  Mr. and Ms. Minsquero, you
18  heard our discussions?
19          MS. MINSQUERO:  Yes.
20          MR. MINSQUERO:  Yes.
21          THE COURT:  And you understand what we're doing
22  here?
23          MS. MINSQUERO:  Yes.
24          THE COURT:  And that if you sign this bond,
25  you're putting up your house and if Vincent violates the

Transcriptions Plus II, Inc.

69

Proceedings

1  terms of his release, there goes the house.

2          MR. MINSQUERO:  Mm hm.

3          MS. MINSQUERO:  There goes me.  I'll be dead by

4  then.

5          THE COURT:  Right.  And Mr. Spano, the same

6  thing.

7          MR. SPANO:  Yes.

8          THE COURT:  All right.  So please do everything

9  in your power to make sure that Vincent complies with the

10 terms of his release.  Okay?

11         MR. SPANO:  Yes.

12         MS. MINSQUERO:  Thank you.

13         THE COURT:  All right.  Since you're putting up

14 your homes, I won't ask you questions about work and all

15 of that because there's enough --

16         MR. MINSQUERO:  We're both retired.

17         MS. MINSQUERO:  We're both retired.

18         THE COURT:  All right.  Okay.

19         MR. SPANO:  All three of us are retired.

20         THE COURT:  Okay.  You're going to have to sign

21 the bond.  You're also going to have to post what are

22 called confessions of judgment. I think that's what they

23 call them, on the properties so that it's secured, and

24 you can do that by Wednesday.  Counsel will help you get

25 those prepared.  All right?  Okay.  Why don't you come on

70

Proceedings

1   up so you can sign the bond right up here.  And then

2   we'll give it to Mr. Minsquero.  He'll sign it.

3         Gentlemen, I want to -- I think we could

4   probably conclude with that, but I want to give you three

5   warnings.  You're each going to get, if you're

6   released -- you're not going to be released tonight,

7   you'll be released tomorrow if I'm not reversed.  And

8   you'll get the bond and you'll see all of the

9   requirements on it.  You'll be able to read it and

10  understand it.  You have to comply with that bond 100

11  percent.  Don't give the AUSAs any cause to come to court

12  and say hey, they violated their bond because you will be

13  detained, I guarantee you.

14        In addition to everything that appears on that

15  bond, three very important warnings that you need to get.

16        You commit any crimes when you're released, any

17  crimes, federal, state, or local, it's a violation of the

18  bond so you can be detained plus face charges for any

19  crimes you may commit.

20        If you fail to come to court when you're

21  supposed to, that is a violation of the bond, so you

22  could be detained on these charges until your trial plus

23  face a charge of bail jumping.  And if you're convicted

24  of the underlying charges and a bail jumping charge, your

25  sentences will be served consecutively, one after the

71

Proceedings

1   other.

2          And if you attempt to influence the testimony

3   of any witness that may appear against you, that's a

4   violation of the bond, also subject you to a charge of

5   witness tampering.  And if you're convicted of the

6   underlying charges and witness tampering, your sentences

7   will be served consecutively.

8          So come to court when you're supposed to, don't

9   commit any crimes, and don't talk to any witnesses.

10  Understood?

11         MR. GOSNELL:  Your Honor, with respect to Mr.

12  Rappa, I would just ask if your Honor would be willing to

13  sign a medical order to ensure that he gets his

14  medications?  They're indicated on I believe it's page 2

15  of his Pretrial Services report, both of which are for

16  his asthma.  And unfortunately, because of the nature of

17  the disease, they can pop up sort of at any time.  It's

18  the next to the last paragraph, your Honor.

19         THE COURT:  We will do a medical memo.  And I

20  can't guarantee when they would be able to get him the

21  inhalers, but they'll be alerted to it.

22         MR. SCHULMAN:  Your Honor, for Mr. Vicari, I

23  would similarly request a medical memo for heart related

24  medication that Mr. Vicari takes on a twice daily basis.

25  As I understand, the agents have a supply of it here.

72

Proceedings

1          THE COURT:  They will not, MDC will not allow

2     that medication in.  They will have to prescribe it from

3     their formulary.  Do you have the names of it?  You could

4     write it down and --

5          THE CLERK:  Yeah.  Just hand it to me.

6          MR. SCHULMAN:  Let me get the specific names

7     and I'll provide them after.  If I can get it in a couple

8     of minutes?  I think one of the agents that's in the room

9     may have the medication on them.

10          THE COURT:  Give us the names of the

11     medication.  We'll put it in a medical memo and send it

12     to MDC.

13          MR. SCHULMAN:  I'll do that before I leave

14     today.

15          THE COURT:  Okay.

16          MR. SCHULMAN:  Thank you.

17          MR. GELORMINO:  I would need one also on behalf

18     of Mr. Minsquero, your Honor.  He's on a blood pressure

19     medication, just one.

20          THE COURT:  List it.

21          MR. GELORMINO:  Just to be safe.  Is it listed?

22          DEFENDANT MINSQUERO:  I gave it to them before.

23     I gave them the name and --

24          MR. GELORMINO:  He gave the medication.

25          DEFENDANT MINSQUERO:  And they took the

73

Proceedings

1  medication this morning.

2          MR. GELORMINO:  They're still not going to

3  allow you to take it.

4          THE COURT:  You gave them --

5          DEFENDANT MINSQUERO:  I gave them the name this

6  morning of the --

7          MR. GELORMINO:  Of the medication.

8          THE COURT:  Who's they?

9          DEFENDANT MINSQUERO:  One of the agents who was

10 doing the paperwork.  He was doing paperwork.

11         THE COURT:  Why don't you tell me what the

12 medication is?

13         DEFENDANT MINSQUERO:  It's folic acid.

14         THE COURT:  Okay.

15         MR. MARTINELLI:  And lastly, for myself, I do

16 not need a medical order.  I would like to alert the

17 Court that Waldorf Carting, a witness in this case,

18 continually calls my client and asks him for work, for

19 him to send his machines, that the government be on alert

20 not to -- you know, he's not going to accept any work,

21 but they can't call him and ask to send his machines now.

22 So I think it's important for this case that the Court

23 realizes that the carting company continues to call him.

24         THE COURT:  That has nothing to do with me.  If

25 they call him, he can say I can't talk to you.

74

Proceedings

1          MR. MARTINELLI:  I agree.  I'm just alerting --

2   I'm making a record for the people, for the government.

3          MR. GELORMINO:  Your Honor, one last thing.  My

4   client gave you the wrong medicine.  Losartan, he's on

5   Losartan.

6          THE COURT:  Losartan?

7          DEFENDANT MINSQUERO:  Losartan, yeah.

8          THE CLERK:  Losartan?

9          THE COURT:  How do you spell that, please?

10          DEFENDANT MINSQUERO:  L-O-S-S-A-R-T-I-N.

11          THE COURT:  Are you also on folic acid?

12          DEFENDANT MINSQUERO:  No, no, it stopped.  They

13   switched it.

14          MR. GELORMINO:  They switched it.

15          THE COURT:  Okay.  Michelle?

16          THE CLERK:  Yeah.

17          THE COURT:  Here.  This is for Mr. Minsquero.

18   He's on Losartan.  And that's for the other one.  Okay?

19          MR. GELORMINO:  Thank you, your Honor.

20          THE COURT:  All right.  Is there anything else?

21   Because we have another --

22          MR. GALEOTTI:  It's incredibly brief, your

23   Honor.

24          One, we've made, as required, we've made

25   consular notification with respect to Mr. Vicari.  He's

75

Proceedings

1    the only defendant for which that's required.

2            And second, we've endeavored to make victim

3    notifications and will continue to do so.

4            THE COURT:  Thank you.

5            MR. GALEOTTI:  I thank the Court for its time.

6            ALL:  Thank you.

7                    (Matter concluded)

8                        -oOo-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

76

# C   E   R   T   I   F   I   C   A   T   E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **10th** day of **November**, 2023.

*Mary Greco*

Transcriptions Plus II, Inc.